**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jesus Ramon LOPEZ,
Defendant-Appellant.**

**No. 79–1051.**

United States Court of Appeals,
Ninth Circuit.

Submitted April 17, 1980.

Decided Aug. 19, 1980.

---

Edward P. Moffat, Asst. Federal Defender, Fresno, Cal., for defendant-appellant.

David F. Rodriguez, Asst. U. S. Atty., Fresno, Cal., for plaintiff-appellee.

Before MERRILL and WALLACE, Circuit Judges, and WYATT,* District Judge.

WYATT, District Judge:

This is an appeal by Jesus Ramon Lopez (Ramon) from a judgment of conviction, entered in the United States District Court for the Eastern District of California, on one count of an indictment charging him and six others with conspiracy in violation of 21 U.S.C. § 846. The object of the conspiracy was charged to be to possess with intent to distribute a controlled substance (heroin) in violation of 21 U.S.C. § 841(a)(1). A jury found Lopez guilty on the one count described, after a trial before Honorable M.D. Crocker, District Judge.

The six others charged in the conspiracy count were Federico Parra Fierro (Federico), Alberto Parra Fierro (Alberto), Paz Margarita Garcia de Parra (Margarita), Camerina Parra Villa (Camerina), Enrique Lopez Beltran (Enrique), and Jose Bonifacio Garcia (Garcia). Federico and Margarita are husband and wife who lived at 1438 Eighth Street in Mendota, California. Federico and Alberto are brothers. Enrique and Camerina are husband and wife, who lived in Santa Ana, California, where appellant Ramon also lived.

The indictment was returned on September 21, 1978. Count I was the conspiracy count already described. Count II charged all the defendants except Garcia with possession on August 30, 1978, with intent to distribute, of 50 ounces of heroin in violation of 21 U.S.C. § 841(a)(1). Count III charged Enrique with possession of a firearm during the commission of the felony charged in Count II, in violation of 18 U.S.C. § 924(c). Count IV charged Federico, Margarita and Garcia with the sale on August 7, 1978, of 50.6 grams of heroin, in violation of 21 U.S.C. § 841(a)(1). Count V charged Federico and Margarita with the sale on August 15, 1978, of one ounce of heroin, in violation of 21 U.S.C. § 841(a)(1).

The trial of Alberto and Ramon on Counts I and II—the only counts naming them—took place at Fresno before Judge Crocker and a jury in November, 1978. We are not told what happened to the defendants named in the indictment other than Ramon. The transcript indicates that Enrique and Camerina were released on bail, that they jumped bail, that apparently they fled to Mexico, and that a warrant for their arrest is outstanding; and that Federico pleaded guilty to some count or counts and was sentenced. We do not know what happened to Alberto at the hands of the jury; there is no transcript of the jury verdict. Apparently Garcia and Margarita were not brought to trial; what the status of the indictment is as to them does not appear.

The docket shows as to Ramon that on November 14 the jury returned a verdict of guilty on Count I and could not reach a verdict on Count II.

* Honorable Inzer B. Wyatt, United States District Judge, Southern District of New York, sitting by designation.

The docket shows that after the verdict was returned, a motion for a mistrial (this must be an error; the motion must have been for a new trial) was made for Ramon and denied from the bench without opinion. The docket shows that a motion for judgment of acquittal was made for Ramon and denied from the bench without opinion.

The sentence imposed on Ramon on January 22, 1979, was to imprisonment for five years and a special parole term of three years. Count II was ordered dismissed, on what ground and by what authority are not made to appear.

This appeal followed. In default of $25,000 cash or surety bond, Ramon has been confined pending this appeal.

We conclude that the evidence was ample to establish that there was a conspiracy as charged but was clearly not sufficient to establish that Ramon was a knowing member of and participant in that conspiracy. We are therefore obliged to reverse the judgment of conviction.

## 1.

After the government had rested, a motion was made for Ramon for a judgment of acquittal on both counts. Fed.R.Crim.P. 29(a). The motion was denied. We review the evidence, as it might arguably affect Ramon and his motion, received during the government's case.

Two purchases, and an attempted purchase, of heroin were made in August 1978 by an undercover officer, Deputy Moses Rodriguez (Moses) of the office of the Sheriff of Tulare County. This was done as part of an investigation of the heroin activities of Federico, who lived with his wife, Margarita, at 1438 Eighth Street in Mendota. The investigation was a cooperative endeavor of the Federal Drug Enforcement Administration, the California Bureau of Narcotics, the Sheriff of Fresno County, the Sheriff of Tulare County, and the Fresno Police Department. The controlling officer of the investigation, DEA Special Agent Plavan, testified that the investigation was of Federico; so far as appears, the officers did not have any knowledge or information as to Ramon. There was testimony by Moses that he had never seen or heard of Ramon until after Ramon was arrested.

Plavan knew Jose Garcia in Fresno as an illegal alien who had been earlier arrested and knew that Garcia was acquainted with Federico and Margarita. Plavan had no reason to believe that Garcia knew Ramon, Enrique, Camerina, or Alberto.

Plavan suggested to Moses that he get in touch with Garcia, that he ask Garcia to arrange for the purchase of some heroin (presumably from Federico), and, if successful, that Moses pay Garcia $100 for so doing.

Moses, in a Ford LTD undercover auto, drove to a radio station in Fresno on August 7 (unless otherwise indicated, all dates are in 1978) and talked to Garcia, who worked there. He introduced himself as "Pancho" and told Garcia that he wanted an ounce of good heroin. Garcia telephoned Federico. Then they (Garcia and Moses) left for Mendota. On the drive over, Garcia explained that they were going to the better of the two persons he knew who were selling heroin; also that he had been arrested before, that there was an investigation going on about law enforcement in Fresno, and that it would be safer to go to a smaller town where the police patrol was not as heavy as in Fresno.

Moses, in the Ford undercover auto, was taken to the residence of Federico in Mendota where he was introduced to Federico and Margarita as "Pancho". Garcia told Federico that Pancho wanted an ounce of heroin. Federico brought out an ounce, put it in a plastic baggie, and gave it to Pancho who satisfied himself that it was heroin; Pancho gave Federico $1,000 or $1,500 in currency as payment for the heroin.

Thereafter, Moses telephoned Federico on August 15 and told him that he (Moses) was on his way to Mendota. He got there and bought another ounce of heroin from Federico; he paid $1,005 for it. In the house at the same time were Margarita, an older woman not then identified, and an unidentified man. After the purchase, Moses talked with Federico about obtaining 40 to 48

ounces of heroin. Moses had not been introduced to the other man present, but when Moses asked about a larger quantity, the unidentified man interrupted to say: "We can sell you 300 ounces if you want." Federico said he would give the price later for the larger quantity. Moses said he would telephone to learn the price.

At the transaction on August 15, Moses tried to learn from Federico where he got his heroin. Federico said that "he had connections in Santa Ana", that "he'd been dealing heroin for two years out of the Santa Ana area", and that "he got paid so much an ounce for selling it".

When Moses went on August 7 and 15 to the residence of Federico, there were other officers in the residence area also assigned to the investigation; they were circling in vehicles.

Moses telephoned to Federico on August 21. Federico said he had gone to Santa Ana, had talked to "the boys from Santa Ana", and the price for 40 ounces was $54,-000 to $56,000. Moses said he wanted 8 or 10 ounces more than the 40 ounces and would call on August 28.

Moses telephoned again on August 28. Federico said that "the people from Santa Ana" had misquoted the price, that "she quoted me the wrong price. The lady from Santa Ana", that the price should have been $62,000, and that he had got them to agree to sell for $60,000. Moses said he would pay the $60,000 but wanted 8 or 10 ounces more, for delivery on August 30. Such was Moses's testimony, but in his written reports there is no reference to any "boys from Santa Ana" and Moses testified that he had concluded that the "she" was the "ramrod of the transaction". Moreover, there is nothing to show that Ramon was included in the term "boys from Santa Ana"; true, he lived there and is a male but Santa Ana, a town of some 100,000, must have 50,000 males.

Moses telephoned on August 29. Federico told him that the people from Santa Ana would be at his house the next day, that he (Pancho) should come to Mendota the next day and telephone Federico from a store nearby, that they could then meet, and that they "would make the transaction there". Moses agreed.

On August 30 (a Wednesday), the officer group met in a briefing session on the transaction expected to take place. Moses telephoned Federico and said that he was leaving the Sacramento area.

The telephone conversations between Moses and Federico up to this point were tape-recorded and later transcribed. They were in Spanish and the Spanish transcript was translated into English. The government did not offer these transcripts or their translations in evidence and, although made available to the defense, they were not offered by the defense either. It seems to be undisputed that at no time in any of the conversations was there any reference to Ramon. Moses testified that whenever Federico referred to his connection in Santa Ana from whom he obtained the heroin, he referred to that connection "as 'she' from Santa Ana"; Moses so stated in his written report made shortly after the events occurred. In that written report, Moses also stated that Federico had told him on the telephone that there would be two people from Santa Ana at his residence on August 30 and that they were the owners of the heroin.

Moses drove on August 30 with another undercover officer to Mendota and to the parking lot of the Circle K Market in Mendota. This location had been picked by one of the law enforcement officers. In the parking lot, about two car lengths behind Moses, was an undercover van in which were Plavan and four other officers. In the general area in Mendota of the Circle K parking lot and 1438 Eighth Street was an undercover vehicle with two officers (Franzen and Miller); their primary duty was to make notes on the times of events. An undercover van with three officers was stationed at a "point position" from which 1438 Eighth Street could be kept under observation. An undercover vehicle with two officers (Sherrington and McLaughlin) was stationed near the Mendota Airport, about half a mile from the Circle K Market;

their primary mission was to execute a search warrant for 1438 Eighth Street. Two officers were in an airplane flying above Mendota; they were to observe activity on the ground. All these separate units were in constant communication by radio.

From the Circle K parking lot Moses telephoned Federico and reported his arrival and position. Federico said he would be there shortly. He came in a two-door blue Pontiac to a spot nearby in the parking lot. Another man was in the Pontiac. Federico and Moses got out and met in front of the Market. Federico identified the man with him as his brother, Alberto, who remained in the car. Moses identified the man with him as "my business associate, a cousin." Federico said he had the 40 ounces plus an extra 8 ounces and wanted to count the money. Moses took him to the undercover auto and put him in the rear seat. Moses then gave him a paper sack containing $72,000. Federico then counted this. Moses was in the driver's seat. After Federico had counted the money, they talked about his returning with 48 ounces of heroin for which Moses was going to pay the $72,000. Federico said he would leave the area and come back, possibly with one or two more people who would be "relatives", that he would be going to his house, and that the people coming back with him would be the owners of the heroin. Federico emphasized that "everybody involved was family", that "everybody was related to each other", and that "everybody there were relatives".

Observation of the residence of Federico began on August 30 at about 2 p. m. At that time a blue Pontiac was parked in front and a grey Chevrolet, registered in the name of Camerina, was parked some distance away on Highway 180.

When the blue Pontiac returned after the first meeting of Federico and Moses in the Circle K parking lot, Federico and Alberto met with "other subjects" on the front lawn. Then Enrique walked away and went to the grey Chevrolet parked on Highway 180. He drove the Chevrolet to Federico's house and parked it in front. He got out and went into the yard for a moment, then went back to the Chevrolet, opened the trunk, took out a colored box, and went into the house. As soon as he went into the house, the curtains in one of the bedrooms closed.

Federico and Alberto then returned in the blue Pontiac to Moses in the Circle K parking lot. Federico and Moses got out of their cars and talked, standing back of the Pontiac. Federico said "they" would not trust him with the large amount of heroin and asked Moses to go to his house and do the transaction there. Moses refused (he had been instructed to do the transaction at the parking lot, that if he left the parking lot, not to take the money with him, and that the money was to remain at the parking lot). Moses asked Federico to bring him samples of several ounces of heroin so he could be sure the big amount of heroin was there and then he would go with Federico to his house. Federico agreed and drove off.

When Federico and Alberto returned to the house, they met the others on the front lawn. The group then talked and drank beer. There was testimony that "it appeared to be conversation" but there was no evidence as to what was said.

Then Camerina, Federico and Alberto drove in the blue Pontiac to where Moses was in the Circle K parking lot. Federico was driving; Camerina was in the front seat on the passenger side; Alberto was in the back seat. Federico parked the Pontiac back of the car of Moses and got out. Moses talked to him back of his car. Federico again asked Moses to go with him to his house; Moses refused. While they were talking, Camerina got out of the Pontiac and came up to them, telling Moses that she was "responsible" for the heroin (which Moses understood to mean that she owned it), that she needed to count the money, that she had the heroin, that he could trust them, and that he should come to the house. He must have continued to refuse because Camerina asked if he still wanted the sample. Moses said he did. She said she would go back to the house, get the sample, and bring it to him. They drove off.

When Camerina, Federico and Alberto returned to the house, they went inside with three others from the lawn. Federico had parked the blue Pontiac in the driveway. The grey Chevrolet was still parked in front. Somebody pulled back the curtains in one of the rooms and looked out. Somebody twice looked out the front door. A crippled man with a limp—who could only have been Ramon—came out in the front yard, walked around for a while, and then went back in. Camerina, Federico and Alberto came out and got in the blue Pontiac. Enrique, Ramon and Margarita came out and got in the grey Chevrolet. In the blue Pontiac, the positions were as before. In the grey Chevrolet, Enrique was driving, Ramon was in the front passenger seat, and Margarita was in the back seat. The observing officers advised by radio all others of these moves and further reported that Margarita was carrying a black patent leather purse which was large and full, that she was "clutching it with both hands", and that "it looked like it could contain the contraband which they were anticipating purchasing". Both cars—the blue Pontiac and the grey Chevrolet—then drove off from the residence, westbound on Eighth Street. The Pontiac was leading. The two cars turned south on Highway 180. At Ninth Street, the Pontiac made a right turn into Ninth Street and went west near the Circle K Market, parking on Ninth Street some 30 feet from where Moses was parked. The Chevrolet continued south on Highway 180 to Tenth Street, made a right turn into Tenth Street, went west one block, made another right turn, went north one block to Ninth Street, made another right turn east into Ninth Street and parked, being some 30 to 40 yards from, and facing, the Pontiac also parked on Ninth Street.

Moses then walked from where he was parked and to the passenger side front of the Pontiac. He asked Camerina if they had brought the sample. She said she had. Federico reached down on the lower right of his seat and brought up a small, plastic bag; he handed this to Camerina who handed it to Moses. He examined what was in it and was satisfied it was heroin. ·Camerina· said it was good and asked Moses to go with them to the house, saying that she would count the money there and do the transaction. Moses asked if that was all she had brought. Camerina said: "No, I brought all the dope you want, but you're not getting it until I count the money". Moses said that he would go back with them to the house and started walking to his car. At almost the same time, he gave the arrest signal. Moses had noticed the parked grey Chevrolet and thought there were two people in it. He had never seen them before and had no reason to suppose they were involved in his heroin transactions; he did not have in mind that they would be arrested.

When Agent Plavan saw the arrest signal, he gave orders over the radio to arrest the occupants of the blue Pontiac and also the occupants of the grey Chevrolet. Presumably, his reason for arresting those in the Chevrolet was the information he had received by radio that Margarita, on the back seat of the Chevrolet, was carrying a purse believed to contain the 40 plus ounces of heroin.

Plavan and the officers with him in the van got out and arrested Camerina, Federico, and Alberto in the Pontiac. They searched the three persons arrested and also the Pontiac; these searches found no drugs nor weapons.

Other officers arrested the occupants of the Chevrolet. Ramon came out of the two-door car on the passenger side. It was noticed that he was crippled. He was searched; no drugs nor weapons were found on him. He had $42.55 on his person. A loaded pistol was found on Enrique.

Underneath the driver's seat of the Chevrolet three stacks of currency were found, in total $3,250; two stacks contained $1,300 and the third stack contained $650; there was a rubber band around each stack. An officer testified that at the time $1,300 was the price of an ounce of heroin in Fresno and $650 the price of a half ounce. The six persons arrested each disclaimed any knowledge of the money.

After the occupants were out of the Chevrolet, the officers noticed a black purse on the rear seat, where Margarita had been. As to whether it had been taken out of the car by Margarita when she was arrested and then put back by someone, the evidence is inconclusive. As to whether the purse was open or closed when first seen by the officers, the evidence is also inconclusive. In any event, an officer took the purse from the back seat and examined it. There were three separate compartments in the purse and in each was a tin foil package containing a plastic bag and a brown substance. Documents in the purse had the name "Margarita Parra".

After the arrests and searches on Ninth Street in Mendota, the six persons arrested were taken to the California Bureau of Narcotics in Fresno where their names, addresses, and other personal history were obtained. Ramon gave his correct name, address and telephone number in Santa Ana. He reported that he had partial paralysis. The officers knew that he was physically handicapped and had difficulty walking. Ramon related that he had been in an auto accident and was partially paralyzed as a result, was on Social Security disability, and told Plavan that if it were not for that situation he wouldn't have been caught. Ramon also made a remark: "I knew what was going down."

Plavan testified that he (Plavan) was not fluent in Spanish and that while he was trying to explain and question the arrested persons in Fresno, Ramon, bilingual, helped him in the task. He also testified that the only one of the arrested persons who had been drinking and on whom the odor of alcohol could be smelled was Ramon.

Plavan testified that a check on Ramon was made through the computer system of the Drug Enforcement Administration and that showed no drug activity by Ramon.

The officers on August 30 had a search warrant for Federico's house at 1438 Eighth Street in Mendota. They executed it shortly after the arrests, in the presence of Federico. No drugs nor weapons were found in the residence.

The plastic bag and contents bought by Moses from Federico on August 7 were received in evidence. The government established that the contents weighed 26.06 grams and were 6.4% heroin.

The plastic bag and contents bought by Moses from Federico on August 15 were received in evidence. The government established that the contents weighed 25 grams and were 20% heroin.

The plastic bag and contents received by Moses from Camerina on August 30 were received in evidence. The government established that the contents weighed 1.61 grams and were 12% heroin.

The tin foil, plastic bags, and their contents taken from the black purse found in the grey Chevrolet on August 30 were received in evidence. The government established that the contents weighed 1,206.5 grams and were 14% heroin.

**2.**

■ The principles which govern our review of the evidence have been settled beyond dispute. We must view the evidence in the light most favorable to the government. If a conspiracy has been clearly established—as it was here—slight evidence may be sufficient to connect a defendant with it. The meaning of this last statement, frequently repeated in the opinions of this Court, has been clarified as follows:

> Once the existence of a conspiracy is established, evidence establishing beyond a reasonable doubt a connection of a defendant with the conspiracy, even though the *connection is slight*, is sufficient to convict him with knowing participation in the conspiracy. Thus, the word "slight" properly modifies "connection" and not "evidence." It is tied to that which is proved, not to the type of evidence or the burden of proof.

*United States v. Dunn*, 564 F.2d 348, 357 (9th Cir. 1977) (emphasis in original; footnote omitted).

Applying these principles to the case at bar, the evidence is insufficient to support the conspiracy conviction of Ramon.

Ramon took no part in any of the negotiations for heroin nor in any delivery of heroin. The undercover purchaser of the heroin had never seen or heard of Ramon until after his arrest. None of the investigating officers had seen Ramon until August 30. There is no evidence that he did anything at any time to further the object of the conspiracy. There is no evidence that he had any financial interest in the heroin transactions. He had $42.55 on his person when arrested. There is no evidence that he had anything to do with bringing any heroin to Mendota. There is no evidence that he ever discussed heroin with anybody or that it was ever discussed in his presence. He was not shown to be related to any of the conspirators.

He was in Mendota and at the house of a major conspirator on August 30, the day of the arrests. At the time of arrest, he was in the grey Chevrolet in the passenger front seat with a major conspirator (Enrique) driving and a major conspirator (Margarita) sitting in the back seat with a large quantity of heroin in her purse. There is no evidence, however, that he had any knowledge of their activities. "The government has the obligation to establish not only the opportunity but also the actual meeting of minds. Mere association and activity with a conspirator does not meet the test." *United States v. Basurto*, 497 F.2d 781, 793 (9th Cir. 1974).

In this connection, the government in its brief (p. 22) states: "Margarita's purse, with the foil packages exposed was in plain view on the rear seat (RT 279–280, 288)". We are unable to accept this statement as pointing to anything against Ramon.' The reference is to testimony of Detective Franzen about a time *after* Ramon had been arrested. The testimony was in response to interrogation which began (RT 279; emphasis supplied): "Q. Did you have an opportunity to look into the grey Chevrolet *after the defendants were arrested?*" The testimony was inconclusive as to whether the purse at that time was open or closed but, assuming that it was *then* open, this has no tendency to show that it had been open earlier, when Margarita held it while driving through the streets of Mendota, so that Ramon in the front seat could have seen the "foil packages", much less have realized what they contained. The testimony in fact showed, as will shortly be seen, that when Margarita had the purse it was closed.

In this same connection, the government states (Brief, p. 22) as evidence: "Margarita clutched her full purse, which appeared to contain the heroin (RT 146)." When the cited testimony is read, it turns out that whether the purse contained heroin was sheer speculation on the part of the witness. What he testified was (RT 146; emphasis supplied):

"I further advised that the slender female that went to the Chevrolet was carrying a black patent-leather purse over her shoulder which appeared to be very large and very full and she was clutching it with both hands. And I advised that it *looked like* it *could* contain the contraband which we were anticipating purchasing."

This shows not only that the purse was closed, so that its contents could not be seen, but also that the witness was admittedly guessing what the contents were.

The government presses on us two statements made by Ramon when his personal history was taken after his arrest. He said at one point, explaining his crippled condition, that he had been in an automobile accident, that as a result he was partially paralyzed, and that if it were not for that situation, the police wouldn't have caught him. Presumably, the government would have this an admission that Ramon, had he not been crippled, would have fled and thus have exhibited consciousness of guilt. We do not find such an interpretation convincing. Not even a well and strong person could have thought seriously of flight on foot in the face of an encircling throng of heavily armed officers; in fact, the other five arrested persons, who are not disabled, made no move to flee, nor offered the slightest resistance. Whatever the statement meant, it did not suggest an intent to flee. The other statement of Ramon on

which the government relies was made while the personal history was being written out. Ramon said: "I knew what was going down." The government interprets this (Brief, p. 23) as "an admission of knowledge of the heroin transaction." Unless some special and unique meaning is attached in the area to the expression "going down", of which no evidence was offered by the government, the jury would not be justified in giving to the words the interpretation for which the government contends. At most, the expression was ambiguous. It seems far from an admission that Ramon knew that a heroin conspiracy had been formed and that he was a participant in it.

The evidence offered by the government would not sustain a conviction of Ramon on the conspiracy count.

The Trial Judge denied the motion for Ramon, after the evidence on the government's case was closed, for a judgment of acquittal (Fed.R.Crim.P. 29(a)). We find that this evidence was insufficient to sustain a conviction and that the District Court should have ordered the entry of a judgment of acquittal, as expressly directed by Fed.R.Crim.P. 29(a).

### 3.

■ We have examined thus far only the evidence up to the close of the government's case, this to determine if a judgment of acquittal of Ramon should have been ordered to be entered at that point. We have determined that a judgment of acquittal of Ramon should have been so ordered at that point. Such a judgment was not entered, however, and there was a defense case, not only for Ramon but also for Alberto. At the close of all the evidence, the motion for judgment of acquittal of Ramon was renewed and was denied. After the verdict was returned, a motion for judgment of acquittal of Ramon was made (Fed. R.Crim.P. 29(c)) and was denied. In determining the sufficiency of the evidence to sustain the conviction from which this appeal is taken, our duty is to consider all of the evidence, including that offered for the defense. *Jackson v. Virginia*, 443 U.S. 307,

319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Figueroa-Paz*, 468 F.2d 1055, 1058 (9th Cir. 1972).

■ We turn to the evidence for the defense.

Ramon testified on his own behalf and his testimony was in many respects confirmed by testimony of his father, mother, a friend of his, and a friend of his mother.

Alberto testified on his own behalf and called Federico and his sister Amelida as witnesses. Federico admitted his guilt and exonerated Alberto and Ramon.

This appeal, of course, concerns only Ramon. His case seems entirely believable and if believed would have required a not-guilty verdict. The jury was free, of course, not to believe the defense witnesses, in whole or in part, and the guilty verdict indicates that in some respects at least there was disbelief. But disbelief is not any evidence in support of the conviction.

Viewing the evidence received during the defense case most favorably to the government, there was nothing in that evidence which tended in any way to support the verdict of guilty. We outline that evidence.

Ramon was 28 years old at the time of trial, unmarried, living with his parents in Santa Ana. They have lived in Santa Ana for 18 years. He was born in Capirato, Sinaloa, Mexico and brought to this country when he was about 3 years old. His mother is a native born citizen of the United States and is employed in Santa Ana. His father came from Mexico some years ago, lived in the Mendota area for a few years and eventually settled in Santa Ana. He is employed in construction work. They have lived in the same house for 11 years.

Ramon was employed as a field hand while going to school between ages 12 and 18. In 1969, his last year in high school, he was in an automobile accident and was in the hospital four months; as a result of the accident he became partially paralyzed, crippled, and is unable to work. He was going to a Junior College at the time of trial. He receives Social Security disability benefits.

Ramon has known for some five years Juan Parra Villa who lives in Santa Ana, is married and has two young children. Juan is a welder, employed by a maker of farm equipment. Through Juan, Ramon met his two brothers, Louis and Felipe, and through them met their sister Camerina. Louis and Felipe live in Santa Ana with Camerina and her husband, Enrique. Ramon became good friends with them, drinking beer and watching television several times a month. They spoke on the telephone frequently. In 1978, Camerina telephoned several times asking Ramon to go with her and a child to a doctor who did not speak Spanish; she wanted Ramon's help to interpret. He did this a number of times. Ramon denied that on any visits to the Camerina home he had heard or seen anything having to do with drugs; he denied any knowledge that she or Enrique sold drugs; he denied that he had ever used drugs.

Federico comes from Aguaje, Sinaloa, Mexico. Camerina comes from there also and Federico has known her for many years; he went to school with her and they may be distantly related. Federico first met Enrique in February, 1978, at a baptism party in Santa Ana for a child of Enrique and Camerina.

It was at the same baptism party in Santa Ana that Ramon first met Federico.

In 1978 Federico was living at 1438 Eighth Street and was working on a ranch; his working hours were from four in the afternoon to two in the morning.

In late July, Camerina and Enrique visited Federico in Mendota. Camerina promised to pay him money to help her sell drugs. His first sale was to Pancho on August 7. Camerina had brought the heroin to him from Santa Ana that day. He made the second sale to Pancho on August 15. Then Pancho wanted a kilo of heroin and Federico got quotes from Camerina; all his quotes came from her; he did not discuss prices with anybody else.

Toward the end of August, Ramon was visiting one night with Camerina and Enrique and suggested to Enrique that on Wednesday they go to a movie together.

Enrique said he was going to Mendota on Wednesday to visit some members of their family, mentioning Federico. Ramon asked if he could go along, since he had lived in the Mendota area when he was a child and had friends there, Patrick McCall in Fresno and Ed Layton in Visalia. Enrique went away and asked Camerina. They said he could go with them if he took his truck because they did not want to drive him to see his friends and with his own truck there he could drive himself. McCall and Layton do not speak Spanish; Enrique and Camerina do not speak English. Ramon agreed to take his own truck.

The Wednesday they were talking about was August 30. Early on that day, the two vehicles left Santa Ana, Enrique and Camerina in the grey Chevrolet, Ramon following in his truck. Close to noon, as they were arriving in Mendota, the truck became overheated. Ramon caught up with the car ahead and waved it into the parking lot of the J–Mart Store. He parked the truck, opened the hood, and saw the radiator to be steaming. Ramon was afraid to drive the truck in that condition so he left it parked there and drove to Federico's house in the grey Chevrolet. He sat in the front seat because in his crippled condition it is easier for him to get in and out of the front seat. They arrived at Federico's house about noon. Ramon had not seen Federico since February, and this was the first time he had met Alberto.

On August 30 Federico expected Camerina to be bringing the heroin to his house from Santa Ana; he did not know whether Enrique was coming or not. He did not know that Ramon would be coming to Mendota with them.

After a trip to see Pancho at the Circle K Market, he found Camerina, Enrique and Ramon had arrived at his house. He discussed privately with Camerina the deal with Pancho (Moses); she said she had the heroin with her; and Federico said the buyer was ready.

After another trip with Alberto to see Pancho, they came back and Federico told

Camerina that Pancho wanted a sample. She went into a bedroom and took a sample from a box of Pampers which contained the heroin and which Camerina had brought with her in her car, the grey Chevrolet. Federico then went outside and talked with the others. Then he and Camerina and Alberto left in the blue Pontiac to deliver the sample to Pancho. He did not know that the grey Chevrolet would follow them with Enrique, Ramon and Margarita, nor that Margarita had the heroin in her purse. He was surprised when he found out that the grey Chevrolet was following them. He believed that the heroin was at his house and he had supposed that Enrique and Margarita would be staying there, along with Ramon. After they were arrested, he asked Camerina who had put the heroin in Margarita's purse. Camerina said that she had done it.

During the afternoon before the blue Pontiac drove off, Ramon had been in and out of the house, drinking beer and brandy. He saw Enrique take a box of Pampers out of the trunk of the grey Chevrolet, take it inside, and hand it to Camerina who took it into a bedroom. Ramon never saw the box again and at no time did he touch it; he believed it contained diapers. He asked Enrique several times to take him to pick up his truck because it would have cooled off. Enrique promised but put him off. Then, after the blue Pontiac left, Enrique said they were ready to go, that he would make a short stop but they would soon be at the truck. They got in the grey Chevrolet. Margarita went with them; Ramon supposed that she was going to shop at the J–Mart Store where the truck had been left. Her purse was hanging from her shoulder. He saw nothing unusual about the purse; he never saw any tin foil packages. Enrique drove; Ramon sat in the front seat, again because it was easier for him; Margarita sat in the back seat. They drove to the area of the Circle K store where they stopped not far from Federico's Pontiac which was already there. Then a number of officers came up and they were arrested.

Ramon's mother confirmed in testimony that on Thursday, August 31, she went to Fresno to her friend, Mrs. Palma, who drove her to Mendota to the J–Mart parking lot where she found Ramon's truck parked and needing water. She managed to drive the truck to Fresno and, after servicing, a sister drove the truck to Santa Ana. Mrs. Palma testified and corroborated the account by Mrs. Lopez.

Patrick McCall testified that he lived in Fresno, was a plant supervisor, was married, had children; that he lived and went to school in Santa Ana; that he had known Ramon well for about 13 years; that he visited him often in the hospital when Ramon had his serious accident; that they had maintained their friendship; that he had visited in Ramon's home; that Ramon had visited him in Fresno; that he had several times asked Ramon to visit him in Fresno; that it would not be unusual nor surprising for Ramon to visit him; and that to his knowledge Ramon had never used, nor been involved with, heroin.

Federico, called as a witness by Alberto, testified, among other things, that he was not expecting Ramon on August 30, that he had no conversation with Ramon that day about heroin; that when he (Federico) and Camerina discussed the heroin transaction, Ramon was not with them; that Ramon was not involved in any heroin transaction that day; that before August 30 the only time he had seen Ramon was in February at the baptism party; that he had never talked to Ramon on the telephone; that Ramon was not present when the heroin was put in Margarita's purse; that Ramon told him that he (Ramon) had driven to Mendota in his own truck which had overheated; and that he had seen Ramon's truck.

Ramon testified on his own behalf, among other things, that he had never heard of Jose Garcia (who introduced Moses to Federico); that he had no information that Camerina and Enrique used or sold drugs; that he never talked to them about drugs; that he never saw any drugs in their house; that on August 30 when he left the house in the grey Chevrolet with Enrique

and Margarita, he did not know they were going to stop where Federico was talking to Moses; that on August 30 he did not see any drugs nor hear any talk about drugs at Federico's house; that he did not know there was heroin in Margarita's purse nor in the grey Chevrolet; that he did not know Enrique had a gun; that he did' not know there was money under the driver's seat of the grey Chevrolet; and that he did not know a heroin transaction was to take place on that day.

4.

There were a number of issues raised on this appeal other than the insufficiency of the evidence. It would serve no useful purpose for us to address these issues, however, because there cannot be a second trial of Ramon Lopez; after our reversal for evidential insufficiency, a second trial would violate his constitutional rights under the double jeopardy clause of the fifth amendment. *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).

REVERSED AND REMANDED.