UNITED STATES of America,
Plaintiff–Appellee,

v.

Kenneth Keith WISEMAN,
Defendant–Appellant.

No. 93–10097.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 10, 1994.

Decided June 3, 1994.

Joel C. Parris, Asst. Federal Public Defender, Tucson, AZ, for defendant-appellant.

Virginia C. Kelly, Asst. U.S. Atty., Tucson, AZ, for plaintiff-appellee.

Before ALARCON and FERNANDEZ, Circuit Judges, and HILL, District Judge.[1]

1. Hon. Irving Hill, Senior United States District Judge for the Central District of California, sitting by designation.

Opinion by Judge HILL; Dissent
by Judge ALARCON.

IRVING HILL, District Judge:

Defendant Kenneth Keith Wiseman and four others, Vizcarra, Lopez, Murphy and Branson, were indicted in a two-count indictment for narcotics offenses. Count one charged possession of marijuana with intent to distribute it. 21 U.S.C. § 841 (1988). Count two charged conspiracy to possess marijuana with intent to distribute it. 21 U.S.C. § 846 (1988). The four defendants, other than Lopez, were tried together. Lopez was a fugitive. Vizcarra and Murphy were convicted of both charges. Wiseman and Branson were acquitted on the possession charge but convicted on the conspiracy charge.

Wiseman appeals the conspiracy conviction on the sole ground of insufficient evidence. We reverse his conviction, finding that there was not sufficient evidence to allow a rational jury to find him guilty of the charge beyond a reasonable doubt.

## I. THE TESTIMONY OFFERED AGAINST WISEMAN

The trial consisted almost entirely of the government's case. The only defense evidence was the brief testimony of one defendant, Murphy, and two character witnesses. Murphy's testimony included testimony exculpating Wiseman. It is worth summarizing the government case and describing in detail all of the government's evidence tending to implicate Wiseman.

While working as a DEA informant in May 1992, in Tucson, Arizona, Frank Rendon was contacted, at about the same time, by two persons, co-defendants Lopez and Vizcarra. Lopez told Rendon that he was interested in buying a quantity of marijuana and Vizcarra told Rendon that he had a quantity of marijuana available which he would sell. The DEA gave Rendon permission to set up a transaction between Lopez and Vizcarra. A plan was developed whereby the seller would load the marijuana into a car which the buyer was to furnish. Rendon called Lopez, the buyer, and told Lopez to deliver a car for this purpose to Rendon's house. Lopez, in the company of co-defendant Murphy, brought to Rendon's house a Grand Marquis automobile belonging to Murphy. Murphy was known to Rendon; she had driven marijuana-loaded cars for Rendon in previous transactions. Under the plan, Vizcarra, the seller, was to pick up the car from Rendon's house, take it to another location and load the marijuana into it. When it was loaded, Vizcarra would tell Rendon when and where to pick up the car. Lopez, the buyer, told Rendon that Murphy and Murphy's daughter, Pam Branson, would pick up the loaded car and drive it away for him.

On May 14, 1992, the Grand Marquis, at Rendon's house as per the plan, was picked up by Vizcarra. It was under DEA surveillance. Vizcarra drove the car into a residential property at 2848 Cottonwood Lane. The agents were not able to see what was done to the car thereafter and did not observe its being loaded with marijuana. On the same evening, Vizcarra again met with Rendon, got into Rendon's car with him, and directed Rendon to drive to the Cottonwood Lane address, where Vizcarra told Rendon that the Grand Marquis was parked and loaded. Rendon could see the Grand Marquis on the premises.

Later the same evening, Rendon drove Lopez to the Cottonwood address and showed him where on the premises the Grand Marquis was parked. Rendon then took Lopez to a bar so that the latter could, by telephone, tell Murphy to come and pick up the loaded car and where to find it.

At about 7:15 P.M. of the same evening, a Cadillac came to the Cottonwood Lane address. In it were three persons: Murphy and her daughter, Branson, who as stated, had been designated to drive the loaded Grand Marquis away, and defendant Wiseman. Branson was driving the Cadillac. DEA agents were surveilling the Cottonwood Lane property and saw the Cadillac approach. They later saw the Grand Marquis being driven out of the premises with Wiseman driving and Murphy as passenger. DEA agents followed the Grand Marquis to a house at 4902 Massingale Road. Branson resided there. The Grand Marquis, with Wiseman still driving, was parked in the

carport at the rear of the Branson house at about 7:35 or 7:40 P.M. A DEA agent, who had been surveilling the movements of the Grand Marquis, testified that Wiseman drove down Massingale Lane "approximately three times slowly by two or three different streets" before finally parking the car. But the same DEA agent, on cross-examination, said that there was nothing surreptitious, secret or unusual about the route taken or the way the car was driven.

Between 8:30 and 9:00 P.M., Lopez showed up at Rendon's house and told Rendon that Murphy was staying away from the loaded car because there was a "problem". The problem was the suspicion that there was "heat" on the car.

The loaded car remained under surveillance at Branson's house but was not picked up by anyone or even approached by anyone until after 9 P.M., by which time some co-defendants had been arrested at another location.

There was apparently no surveillance of Wiseman and Murphy after they parked the Grand Marquis at Branson's house on Massingale Road. Moreover, there had apparently been no surveillance of the Cadillac after it had earlier dropped Murphy and Wiseman off at the Cottonwood Lane property. At about 9:00 P.M., DEA agents again spotted the Cadillac on Massingale Road. They followed it to a Circle K parking lot. Murphy, Branson and Wiseman were in it along with a grandson of Murphy's. All four occupants were arrested at the Circle K parking lot at about 9:15 P.M., and thereafter the agents drove all of the arrestees back to Branson's house. They were kept in a van and apparently could not see what was happening. The loaded Grand Marquis was thereafter seized and the trunk was opened to reveal the marijuana. A DEA agent testified that he could smell the marijuana from outside of the car before the trunk was opened and he could smell an even stronger marijuana smell when seated inside the car. After the marijuana was found, the Branson

house was searched. No marijuana was found therein.

The arrestees were taken to a DEA office at about 11:00 P.M. The arresting agent testified that he had told Wiseman only that Wiseman had been arrested on a narcotics charge without mentioning any specific substance. At the DEA office, Wiseman asked a different agent if the agents had found anything at the house. The agent replied that he did not understand what Wiseman was talking about. Wiseman then asked if they found any marijuana at the house.

■ The government's case did not contain any evidence that mentioned Wiseman in any way or in any connection, prior to the time he was seen driving the Grand Marquis to Branson's house on Massingale Road. Rendon, the informant who had made all of the arrangements with both sides, testified he had never heard of Wiseman. No evidence was offered that any DEA agent had ever heard Wiseman's name prior to his arrest or that Wiseman took any part in any of the conversations in which arrangements were made. Nor was Wiseman's name even mentioned in any of such conversations. There was no testimony from which it could even be inferred that Wiseman knew what marijuana smelled like and no testimony that Wiseman actually smelled the odor in the car.

As previously stated, Murphy took the stand in her own defense, and her testimony exculpated Wiseman. She described Wiseman as a family friend who "grew up" (apparently as close friends) with her children. Presently Wiseman was helping her maintain a rural six-acre property. She testified that Wiseman had come along in the Cadillac to fetch the Grand Marquis at her invitation and had offered to drive it back from the Cottonwood address. She accepted his offer because she did not like driving at night. Rendon testified that Lopez earlier had told him that Murphy did not like to drive at night because of eye problems.[2]

---

**2.** We are aware that the jury rejected Murphy's contrived and far fetched explanation of her role in the transaction. We are also aware that the question of sufficiency of evidence must be decid-

ed only on the basis of the government's evidence. We do not rely on Murphy's testimony in reaching our decision to reverse. We only mention her testimony concerning Wiseman because

## II. ANALYSIS

■ Wiseman does not challenge the existence of a conspiracy involving his co-defendants. He only challenges the sufficiency of the evidence connecting him to the conspiracy. "In considering a challenge to the sufficiency of the evidence, we consider 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Bautista–Avila*, 6 F.3d 1360, 1362 (9th Cir.1993) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). To support a conviction of conspiracy, "[e]vidence has to be produced to show that [the person charged as a co-conspirator] had *knowledge* of the conspiracy and acted in furtherance of it. Mere casual association with conspiring people is not enough." *Bautista–Avila*, 6 F.3d at 1362 (quoting *United States v. Cloughessy*, 572 F.2d 190, 191 (9th Cir.1977)). But where there is evidence establishing the existence of a conspiracy, if the government is able to establish even a slight connection with the conspiracy beyond a reasonable doubt, it is sufficient to support a conviction. *Id.*

The totality of the government's evidence against Wiseman, even giving all reasonable intendments to that evidence, is not enough to warrant a rational jury determining that he had knowledge of this conspiracy and acted in furtherance of it.

■ The evidence against Wiseman consists of three disparate pieces: (1) he drove a car which had been loaded with marijuana and which was described as having a strong smell of marijuana inside it; (2) before parking that car, he drove somewhat unusually or suspiciously (this evidence was greatly weakened on cross-examination); and (3) after he was arrested, he asked some questions about the presence of marijuana at Branson's house. Each of these are consistent with totally innocent explanations. He may well have been driving the car as a convenience to Murphy, his old family friend and employer,

who was loathe to drive at night because of eye problems. He may well have asked the questions about marijuana being in the house because he had been arrested some hours earlier, did not know what was happening, and was merely trying to find out what had happened. The house was that of Murphy's daughter with whom he had grown up. Moreover, there was no evidence to show that he knew what marijuana smelled like or that he in fact could smell the marijuana on this occasion. But even if there had been such evidence, knowledge that drugs are present is insufficient to prove knowing involvement in a drug conspiracy. *See United States v. Sanchez–Mata*, 925 F.2d 1166 (9th Cir.1991). Finally, one of the government's most important pieces of evidence, Wiseman's driving patterns, was weakened considerably on cross-examination.

The totality of the government's evidence against Wiseman must be regarded as extremely weak, especially as compared to other similar cases in this circuit.

## III. PREVIOUS CASE LAW

We have examined the previously reported narcotics conspiracy cases in this circuit in which the conviction of an alleged conspirator was *reversed* for insufficiency of the evidence connecting him with the conspiracy. It appears that in many of those reversals the evidence connecting the successful appellant with the conspiracy was considerably stronger than the evidence in this case against Wiseman. Moreover, we have found no *affirmance* in such a case where the evidence was anywhere near as weak as the evidence against Wiseman in the instant case.

Among the reversals on stronger evidence, the following cases are noteworthy: *United States v. Ramos–Rascon*, 8 F.3d 704 (9th Cir.1993); *United States v. Bautista–Avila*, 6 F.3d 1360 (9th Cir.1993); *United States v. Lopez*, 625 F.2d 889 (9th Cir.1980); *United States v. Cloughessy*, 572 F.2d 190 (9th Cir. 1977).

---

it suggests a quite rational innocent explanation of why Wiseman was along for the pick up of the load car and how he came to be driving it.

Moreover, the government does not challenge Murphy's testimony in these respects.

In *Bautista–Avila,* the evidence against the defendant was as follows:

(1) The defendants in that case drove into the United States from Mexico only one minute apart from the car in which 24 kilos of cocaine were ultimately found. (2) On the day of the drug transaction, a conspirator retrieved the keys to the car carrying the cocaine from the motel room that one of the defendants had rented and in which both defendants, as well as a co-defendant, were staying. (3) On his arrest, a conspirator confessed to law enforcement officers that both the defendants' car and the other car were involved in the conspiracy. (4) One defendant admitted that he gave the second defendant $5,000 "to hold." The second defendant admitted that he hid the $5,000 in the dashboard of their car. Five thousand dollars was the exact amount that one of the conspirators was to receive for participating in the conspiracy. (5) Both defendants were arrested in the motel room where the drug transaction was to take place and directly in front of the · place where both cars were parked. (6) Both defendants made various attempts to conceal their identity, including renting the motel room under an assumed name.

The above quoted summary of the *Bautista–Avila* facts appears in a later case, *United States v. Ramos–Rascon,* 8 F.3d at 710.

In *Lopez,* the evidence against the successful appellant was summarized in a later decision of the circuit as follows:

[Defendant] 1) spent the day with major drug conspirators, 2) walked around the perimeter of the conspirators' house after someone looked out of the window once and out the front door twice, 3) accompanied conspirators to the scene of a drug transaction, and 4) told arresting officer that he "knew what was going down," and that, but for a leg injury, he. would never have been caught.

*United States v. Penagos,* 823 F.2d 346, 350 (9th Cir.1987).

The *Penagos* opinion also summarized the evidence against the defendant in *Cloughessy* as follows:

Cloughessy drove two acquaintances who clearly were involved in a narcotics conspiracy to a hotel for negotiations with undercover Drug Enforcement Agents agents [sic]. Cloughessy and the two conspirators followed the agents to a restaurant during a break in negotiations. While the conspirators remained in the automobile, Cloughessy entered the restaurant, used the rest room, and returned to the automobile. He obtained money from the conspirators, reentered the restaurant and drank beer until the agents left. Cloughessy then drove the conspirators back to the hotel for further negotiations. When one of the DEA agents left the hotel to obtain purchase money from the DEA office, Cloughessy tailed him and reported his findings to the conspirators.

*Id.*

In *Ramos–Rascon,* convictions against two defendants were reversed for insufficiency of evidence. The evidence against them included testimony that they were present when some of their co-defendants discussed the terms to be offered to an undercover government agent in connection with a forthcoming cocaine deal. They thereafter rode in a truck with a member of the conspiracy, Lopez. It followed closely behind another truck which was transporting five kilos of cocaine to the hotel where the transaction earlier discussed was to take place. The informant had earlier been told that some of the proceeds from the transaction would be paid to "Lopez and his people." At the hotel, both defendants sat on a wall near the room where the transaction was being consummated, looking intently at passing cars. One of the defendants, when approached by officers attempting to arrest him, tried to run away and was caught at the scene. *Ramos–Rascon,* 8 F.3d at 707.

When we compare these cases to the case on appeal, we are convinced that the government failed to connect Wiseman to the conspiracy beyond a reasonable doubt. In this case, the only evidence submitted by the government is wholly susceptible to innocent explanations, and the government failed to submit "sufficient probative facts from which a rational factfinder ... could choose the

hypothesis that supports a finding of guilt rather than hypotheses that are consistent with innocence." *United States v. Bishop,* 959 F.2d 820, 830 (9th Cir.1992). Moreover, one of the government's key pieces of evidence, Wiseman's unusual driving, was greatly weakened on cross examination of the testifying agent. Even when the evidence is viewed in the light most favorable to the government, it is insufficient to support the conviction for conspiracy.

## IV.  CONCLUSION

In light of the decisions summarized above and the guiding principles of this circuit and the Supreme Court, we conclude that there was insufficient evidence for a reasonable jury to find beyond a reasonable doubt that Wiseman knowingly participated in this drug conspiracy.

**REVERSED.**

ALARCON, Circuit Judge, Dissenting:

I respectfully dissent. I would affirm the judgment of conviction.

The single issue before this court is whether the evidence produced by the Government at trial was sufficient to connect Kenneth Keith Wiseman to the conspiracy alleged in the indictment. After receiving appropriate instructions on the Government's burden of persuasion and reasonable doubt, twelve jurors unanimously agreed that Wiseman was guilty of conspiring to possess marijuana with the intent to distribute it. The same jury found Wiseman not guilty of possession of marijuana with intent to distribute it. The experienced trial judge who heard each of the witnesses denied Wiseman's successive motions for a judgment of acquittal. In each motion, Wiseman argued that the evidence was insufficient.

Relying primarily on the testimony of Alice Murphy, a codefendant, the majority has concluded that the jury acted irrationally in finding beyond a reasonable doubt that the evidence was sufficient to connect Wiseman to the conspiracy. Murphy testified that she and Wiseman were not involved in a conspiracy to distribute marijuana, and that she did not know that the automobile contained mari-

juana. The jury, however, rejected Murphy's testimony, and found her guilty as charged. In view of the jury's determination that Murphy was not a credible witness, we are precluded from considering her testimony in determining whether the Government's evidence was legally insufficient to connect Wiseman to the conspiracy. The Supreme Court has instructed us that in reviewing for sufficiency of the evidence, we must "view the evidence in the light most favorable to the prosecution." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

The majority's acceptance of Murphy's discredited testimony as true, and its rejection of the jury's finding that Wiseman is guilty, is contrary to our duty under *Jackson.*

### I.

#### *Facts*

The evidence, viewed in the light most favorable to the prosecution, demonstrated that Ernie Lopez and Hugo Vizcarra contacted Frank Rendon, a Drug Enforcement Agency (DEA) informant, to seek his assistance to aid them in arranging a marijuana transaction. With DEA approval, Rendon agreed to participate.

Subsequently, Vizcarra informed Rendon that he had obtained a quantity of marijuana. Rendon told Vizcarra that Lopez wanted to purchase a large quantity of marijuana. Rendon telephoned Lopez and asked him to deliver an automobile to Rendon's house. Lopez and Murphy delivered her automobile, a Grand Marquis, to Rendon's house.

Under the plan, Vizcarra, the seller, agreed to drive the car to the place where the marijuana was stashed. Lopez, the buyer, agreed to pick up the loaded vehicle at a place selected by Vizcarra. Lopez told Rendon that Murphy and Pam Branson would transport the marijuana to the delivery point. Murphy had transported marijuana for Rendon in 1989 and 1990. Rendon was also aware that Branson had driven automobiles containing marijuana for Lopez.

Vizcarra picked up Murphy's automobile from Rendon's house the following day. La-

ter that day, Vizcarra met Rendon at a restaurant. Vizcarra directed Rendon to drive him to 2848 Cottonwood Lane, in Tucson, Arizona. Murphy's car was parked inside the fenced-in yard. Vizcarra and Rendon were followed by DEA agents to the Cottonwood address. The officers set up a surveillance of that location.

Rendon drove Vizcarra back to the restaurant where they met Lopez. Rendon drove Lopez to 2848 Cottonwood Lane and showed him Murphy's automobile. Lopez then telephoned Murphy. Murphy, Wiseman, Lopez, and Branson arrived at the Cottonwood residence in a Cadillac at approximately 7:15 p.m. Wiseman drove the Grand Marquis away from the Cottonwood address. Murphy accompanied him in the passenger seat. Branson drove the Cadillac.

Because the co-conspirators in the Grand Marquis believed they were being followed, Wiseman drove the Grand Marquis to Branson's residence at 4902 Massingale Road in Tucson. DEA Special Agent Richard E. Conin testified that Wiseman drove slowly past Branson's residence on Massingale Road approximately three times. Wiseman parked the Grand Marquis in the carport two or three minutes later. Rendon was told by Lopez that he, Wiseman, Branson, and Murphy drove away from 4902 Massingale Road in the Cadillac to see if "there was heat on the car, if it was being pursued or followed."

Wiseman, Murphy, and Branson were arrested at the Circle K parking lot. They were driven to 4902 Massingale Road in a DEA van. Wiseman and the other arrestees were kept in the van about twenty-five to thirty yards from the residence while the DEA agents executed a search warrant. DEA Special Agent Landberg told Wiseman, Murphy, and Branson that they were under arrest for a narcotics violation. They were not told that the charge involved marijuana.

At 9:45 p.m., the DEA agents searched the Grand Marquis in the carport at 4902 Massingale Road. It contained 105 pounds of marijuana. The DEA agents could smell a strong odor of marijuana emanating from the Grand Marquis as it sat in the carport. The interior of the car also had a strong odor of marijuana. Later in the evening, during the booking process, Wiseman asked DEA Special Agent John Gazzara if they had found anything during their search of the car. Special Agent Gazzara replied that he "did not know what [Wiseman] was talking about." Wiseman then asked whether the officers had found marijuana in the house. Special Agent Gazzara had not told Wiseman he was under arrest for possession of marijuana.

Wiseman did not present any evidence. Murphy testified that co-defendant Pamela Sue Branson was her daughter. Branson lived at 4902 Massingale Road. Murphy lived a short distance away at 4850 West Massingale.

Murphy stated that Rendon was a friend of her deceased husband. She had no knowledge that Rendon was involved with marijuana. He never spoke about marijuana in her presence. Murphy further testified that she had known Lopez for 20 years. She and Lopez had no discussions concerning marijuana.

Murphy denied selling or transporting marijuana on prior occasions. She testified that she had not driven loads of marijuana to Illinois in 1989 or 1990.

Murphy stated that Rendon offered to have a friend fix her air conditioning. Thereafter, when she was ready to have it repaired, she drove the Grand Marquis to Rendon's house. She was accompanied by Lopez. According to Murphy, several days later she became concerned about her car. After trying to contact Rendon by telephone, she called Lopez. He promised to help her by contacting Rendon. On the date she was arrested, Lopez called her and told her he would show her where her automobile was parked.

Murphy stated that she asked her daughter to drive her to meet Lopez. Murphy invited Wiseman to accompany her while she retrieved the Grand Marquis. Murphy, Wiseman, and Branson left 4850 West Massingale in Branson's Cadillac. They met Lopez at the Circle K at 29th and Interstate 10. Lopez entered the Cadillac and directed them to 2848 Cottonwood. The key to the Grand Marquis was in the ignition.

Wiseman volunteered to drive the vehicle. He drove straight down I-10 to Branson's

residence on Massingale Road. The Grand Marquis was parked in the carport so that Wiseman could look at the air conditioner at a later date.

Branson followed them in the Cadillac after dropping Lopez off at the Waffle House on Grant Road. Branson then drove Murphy and Wiseman to Murphy's residence on West Massingale to pick up Murphy's grandson. Branson then drove the Cadillac to the Circle K where they were arrested.

Murphy denied conspiring to possess, transport or distribute marijuana. She denied having any knowledge of her co-defendants' plan to possess or distribute marijuana. She denied knowledge that the trunk of the Grand Marquis contained marijuana. She testified that she "did not smell anything strange in the car." She denied knowing what marijuana smells like.

The jury did not believe her testimony. She was convicted as charged.

## II.

*The Prosecution's Evidence Was Sufficient To Support An Inference That Wiseman Knowingly Participated In a Conspiracy To Distribute Marijuana*

The undisputed evidence demonstrates that Vizcarra agreed to sell 105 pounds of marijuana to Lopez. Rendon acted as the middleman in this transaction. Lopez agreed to furnish an automobile which Vizcarra would load with the marijuana. Lopez would then pick up the automobile at a place selected by Vizcarra and take it to another place where he could unload it without police detection.

The Government's evidence demonstrated that Wiseman drove the automobile containing the marijuana to Branson's residence on Massingale Road. When he arrived at Branson's house, Wiseman drove slowly past it three times before stopping. The interior of the automobile driven by Wiseman had a strong odor of marijuana. After his arrest, Wiseman asked the arresting officers whether any marijuana had been found in the search of Branson's residence at Massingale Road. Based on the totality of these circumstances, a rational jury could properly infer beyond a reasonable doubt that Wiseman was a member of the conspiracy and knowingly participated in the transportation of 105 pounds of marijuana.

The Government's evidence against Wiseman was circumstantial. It has long been decided that the Government need not prove the existence of a formal agreement to do an illegal act. "The existence of a conspiracy may be proved by circumstantial evidence that defendants acted together for a common illegal goal." *United States v. Penagos,* 823 F.2d 346, 348 (9th Cir.1987). "Once a conspiracy exists, evidence establishing beyond a reasonable doubt defendant's connection with the conspiracy, even though it is slight, is sufficient to convict defendant of knowing participation in the conspiracy." *Id.*

Wiseman does not dispute the existence of a conspiracy to possess marijuana for distribution. Rather, he contends that the Government did not produce evidence of his connection with the conspiracy. The circumstantial evidence, when viewed in the light most favorable to the Government, demonstrates that Wiseman transported 105 pounds of marijuana to Branson's residence. Wiseman's knowledge that he was transporting marijuana is demonstrated circumstantially by the suspicious manner in which he drove slowly past 4902 Massingale Road three times before stopping. The record shows that following delivery of the marijuana, Lopez, Wiseman, Branson, and Murphy left the Massingale Road area for an hour because they wanted to find out if they were being pursued. The jury could infer logically from Wiseman's evasive conduct, as well as Rendon's testimony, that Wiseman was checking to see if he was being followed and whether the residence was under police surveillance. Because Branson, Wiseman's passenger, lived at 4902 Massingale Road, it would have been irrational for the jury to have found that Wiseman was confused about his destination, or that his evasive driving maneuver was for an innocent purpose.

In an attempt to minimize the incriminating effect of Wiseman's conduct upon reaching 4902 Massingale Road, the majority states that Special Agent Conin's testimony concerning the unusual circumstance that Wiseman drove the Grand Marquis past Branson's house three times "was *greatly weakened* on cross-examination." Majority

Opinion at 865 (emphasis added). As demonstrated below, the record does not support the majority's characterization of the impact of cross-examination on Special Agent Conin's testimony regarding Wiseman's incriminating behavior.

Q. [by Mr. Bock]:
Now you indicated, sir, that you had an opportunity to follow the Grand Marquis when it left the Cottonwood address; is that correct?
A. Yes sir.
Q. There was nothing unusual about the way the Marquis *drove?*
A. Not that I recall, no, sir.
Q. *It didn't take a surreptitious or secret route to the Massingale property,* did it?
A. Not that I know of, sir.
Q. *It took a direct route?*
A. Yes, sir.

(Emphasis added).

The majority states that Special Agent Conin testified on cross-examination "there was nothing surreptitious, secret or unusual about the route taken *or the way the car was driven.*" Majority Opinion at 864 (emphasis added). Mr. Bock did not ask Special Agent Conin whether there was anything unusual about the fact that Wiseman drove slowly back and forth three times in front of Branson's home. Instead, Mr. Bock's questions were directed at eliciting the fact that Wiseman took a direct, rather than a surreptitious, or secret route to the Branson's Massingale Road property. Special Agent Conin was simply not asked whether he thought it was "unusual" for Wiseman to drive slowly back and forth in front of Branson's home. It should also be noted that Wiseman's attorney does not claim that Special Agent Conin testified that it was not unusual to drive slowly past his passenger's home three times. Instead, counsel argues: "If [Wiseman] was driving for Murphy, then it is a logical consequence that he drove where and how Murphy asked him to drive." Appellant's Reply Brief at 4.

The Government's evidence showed that there was a strong odor of marijuana in the interior of the vehicle. From this fact, a rational jury could logically infer that Wiseman was aware that he was transporting marijuana. It would have been unreasonable for the jury to infer that Wiseman could have believed he was transporting alfalfa or some other innocent crop in the trunk of a passenger vehicle. In light of the totality of the circumstances, the jury could have inferred from Wiseman's concern about whether the officers found marijuana in searching Branson's residence that he had some familiarity with the unique odor of marijuana. Moreover, Wiseman's inquiry about whether the search of Branson's vehicle revealed marijuana, as opposed to heroin or some other contraband, would support a reasonable inference that he knew he was involved in a conspiracy to distribute marijuana.

In two segments of its opinion, the majority has pointed out that Murphy's testimony exculpated Wiseman. Majority Opinion at 863 and 864. In discounting the Government's case against Wiseman, the majority states that Wiseman "may well have been driving the car as a convenience to Murphy, his old family friend and employer, who was loathe to drive at night because of eye problems." Majority Opinion at 865. In arriving at this justification for Wiseman's conduct, the majority relies on Murphy's recital of the facts during her trial testimony. As noted above, the jury rejected Murphy's attempt to provide an innocent explanation for the transportation of the marijuana in her car by Wiseman. By accepting Murphy's testimony as if it were true, the majority has departed from ancient rules limiting appellate review of the evidence, and denied to the Government the right to trial by jury.

### III.

### *The Law of The Circuit Requires An Affirmance Of Wiseman's Conviction*

The majority, citing four prior decisions of this court, argues that in each of these cases, "the evidence connecting the successful appellant with the conspiracy was considerably stronger than the evidence in this case against Wiseman." Majority Opinion at 865. A careful reading of these cases demonstrates that the evidence in the matter *sub judice* is considerably stronger than the facts we found insufficient in those matters.

In *United States v. Ramos–Rascon,* 8 F.3d 704 (9th Cir.1993), we concluded that the

evidence was insufficient to connect the appellant with a conspiracy to distribute cocaine. *Id.* at 710–11. In reaching this conclusion, we noted that *"[t]he appellants' truck did not* 'pass[ ] through [the] parking lot, ... circle[ ] back.... exit[ ] the lot, and *proceed* [ ] *to make 3 laps along the same route,'* as the counter surveillance vehicle did in *United States v. Mares,* 940 F.2d 455, 457 (9th Cir.1991)." *Id.* at 708. (Emphasis added). In the matter before this court, the record shows that the vehicle containing marijuana and driven by Wiseman slowly passed Branson's house three times before he parked it in the carport. Thus, the missing factor we found significant in *Ramos–Rascon,* i.e., evasive driving to detect pursuers, is clearly present in this case.

In *United States v. Bautista–Avila,* 6 F.3d 1360 (9th Cir.1993), we held that the evidence was insufficient to demonstrate that the appellant was connected to a conspiracy because there was no evidence that he "was involved with the ... attempted transfer of the cocaine" from the seller to the putative buyer. *Id.* at 1362. In this matter, the uncontradicted evidence shows that Wiseman transported 105 pounds of marijuana under suspicious circumstances.

In *United States v. Lopez,* 625 F.2d 889 (9th Cir.1980), we reversed a conviction for conspiracy to possess heroin with the intent to distribute it on sufficiency grounds because "Ramon [Lopez] took no part in any of the negotiations for heroin nor *in any delivery of heroin. Id.* at 896. (Emphasis added). Unlike the situation in *Lopez,* the evidence in this matter shows that Wiseman delivered 105 pounds of marijuana to the Branson's residence.

In *United States v. Cloughessy,* 572 F.2d 190 (9th Cir.1977), the uncontradicted evidence showed that Cloughessy had no knowledge that co-defendants Tadique and Rivera agreed to sell heroin to undercover DEA agents on August 24, 1976. *Id.* at 190. On August 24, 1976, Cloughessy attended a birthday party at the Holt residence. *Id.* Tadique, one of the co-conspirators, asked Cloughessy to drive to Chula Vista with him to meet some friends. *Id.* As they were leaving, Holt asked Cloughessy to pick up some butter for the party. *Id.*

In Chula Vista, Tadique met with undercover agents to negotiate a narcotics transaction while Cloughessy remained in the car. *Id.* at 191. When Tadique returned to the car, he pointed out one of the undercover agents as the person he was meeting. *Id.* Cloughessy followed the agent because Cloughessy recognized him as one of Tadique's friends. *Id.* Cloughessy testified that he followed the agent "because he thought it was strange that [Tadique's] 'friend' had a new car when he was not supposed to have any transportation." *Id.* When Holt retrieved his car after Tadique and Cloughessy were arrested, Holt found butter in the front seat of his car. *Id.*

In a per curiam opinion, the majority found that the evidence was insufficient to connect Cloughessy to the conspiracy. *Id.* The majority stated that "[t]he fact that the butter for the Holt party was found in the car supports Cloughessy's claim that ... he had no involvement with the conspiracy." *Id.* By contrast, Wiseman did not testify in the instant matter. No exculpatory evidence was found in the Grand Marquis he was driving.

I disagree with my colleagues that the evidence found insufficient in *Cloughessy* is "considerably stronger" than the proof presented by the Government against Wiseman. The vehicle in which Cloughessy was a passenger contained nothing more than rancid butter. The automobile driven by Wiseman smelled strongly of marijuana and contained 105 pounds of that controlled substance. A fair reading of the cases relied upon by the majority to reverse the jury's verdict should, instead, compel us to affirm the judgment of conviction.

## IV.

### *Conclusion*

I would affirm the judgment of conviction. Wiseman's conduct was sufficient to persuade a rational jury that he knowingly participated in a conspiracy to possess marijuana for distribution.