**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Rene RAMOS–RASCON, Defendant–
Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Alejandro GONZALEZ–VILLEGAS,
Defendant–Appellant.**

Nos. 92–10153, 92–10154.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 5, 1993.

Decided Nov. 2, 1993.

Fernando Fajardo, Tucson, AZ, for defendant-appellant Rene Ramos–Rascon.

Randolfo V. López, López & Pérez–Medrano, P.C., Tucson, AZ, for defendant-appellant Alejandro Gonzalez–Villegas.

David A. Kern, Asst. U.S. Atty., Tucson, AZ, for plaintiff-appellee U.S.

Before: FLETCHER, REINHARDT, and NOONAN, Circuit Judges.

REINHARDT, Circuit Judge:

Rene Ramos–Rascon and Alejandro Gonzalez–Villegas appeal their convictions for conspiracy to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1), and possession of cocaine with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. We hold that insufficient evidence exists to support their convictions, and reverse.[1]

## A. Background

Some time before November, 1990, law-enforcement officers in Tucson, Arizona, began investigating the criminal organization headed by James Piar, a large-scale supplier of cocaine and marijuana. In May, 1991, authorities arrested a member of the Piar organization and persuaded him to turn informant.

Following their instructions, the informant arranged for undercover agents to purchase one kilo of cocaine from the Piar organization. It is undisputed that Ramos–Rascon and Gonzalez–Villegas were not present at the site of this transaction, that their names were never mentioned in the course of the negotiations or other dealings, and that their fingerprints were not found on the wrappings that enclosed the drugs. In fact, there is no evidence connecting them in any way with the transaction.

Eight days later, again through the informant's efforts, the Piar organization and the agents agreed to a second cocaine transaction, this one for 200 kilos. Members of the organization proposed the following terms: the agents were to buy five kilos of cocaine, and, an hour later, an additional 195 kilos. When the agents agreed to these terms, the date, time, and location of the five-kilo delivery were decided upon and communicated to members of the organization. Even under the government's allegations, Ramos–Rascon and Gonzalez–Villegas played a minor role in the transaction. However, they were among the fourteen people arrested after the delivery of the five kilos.

Despite the six months or more of solid investigation, and the inside information provided by the informant, law enforcement officials were unaware until the day of their arrest that Ramos–Rascon and Gonzalez–Villegas existed. Neither the informant nor any government agent had ever seen or

1. Because we reverse on sufficiency grounds, we do not reach the other issues the appellants raise on appeal. Further, because we resolve Gonzalez–Villegas' claims without recourse to the portions of his opening brief that the government has moved to strike, we do not address the government's motion.

heard anything about them, until that day. In fact, the informant did not even learn their names until their trial.

At trial, the government introduced the following evidence: (1) Ramos–Rascon and Gonzalez–Villegas were present when some of the members of the Piar organization discussed among themselves the terms to be offered to the undercover government agents in connection with the second cocaine deal. They said nothing during the meeting, and no one spoke or referred to them. (2) Ramos–Rascon and Gonzalez–Villegas rode in a truck with a member of the conspiracy, Gonzalez–Villegas driving, that followed closely behind the truck that transported the five kilos of cocaine to the hotel where the transaction was to take place. The appellants looked alertly around as they drove. (3) En route to the hotel, the informant was told that some of the proceeds from the sale of the cocaine would be paid to "Lopez and his people." The person in the truck with Ramos–Rascon and Gonzalez–Villegas was named Omar Stewart–Lopez. (4) The appellants' truck overshot the entrance to the hotel parking lot taken by the truck carrying the cocaine, entered the parking lot at a different entrance, and drove back through the lot, parking near the agents' hotel room. (5) At the hotel, Ramos–Rascon and Gonzalez–Villegas sat on a wall, chatting desultorily and looking intently at passing cars, while the cocaine deal was consummated inside. (6) Gonzalez–Villegas tried to run away when officers arrested him. He was caught at the scene.[2]

Ramos–Rascon and Gonzalez–Villegas were both convicted of conspiracy to distribute cocaine and possession of cocaine with the intent to distribute. They were both sentenced to two concurrent ten-year prison terms and two concurrent five-year terms of supervised release. They are currently incarcerated.

### B. Conspiracy to Possess with Intent to Distribute

■ No one disputes that members of the Piar organization conspired to possess cocaine with the intent to distribute it. The issue is whether the government proved beyond a reasonable doubt that Ramos–Rascon and Gonzalez–Villegas knowingly participated in the conspiracy. "Once the existence of a conspiracy is established, evidence of only a slight connection [to the conspiracy] is necessary to support a conviction of knowing participation in that conspiracy." *United States v. Sanchez–Mata,* 925 F.2d 1166, 1167 (9th Cir.1991) (quoting *United States v. Cuevas,* 847 F.2d 1417, 1422 (9th Cir.1988), *cert. denied,* 489 U.S. 1012, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989)). However, that connection must be proved beyond a reasonable doubt. We now consider whether the government proved beyond a reasonable doubt that the appellants played a role in the conspiracy and that the nature of their role was as the government described it.

The government's theory is that Ramos–Rascon and Gonzalez–Villegas engaged in countersurveillance, acting as lookouts and enforcers for the conspirators. We note as an initial matter that this theory is substantially undermined by the testimony of the government's own witnesses. Several law enforcement officers stated at trial that those engaged in countersurveillance for drug dealers commonly possess weapons and communicative devices. However, neither Ramos–Rascon nor Gonzalez–Villegas possessed any means of discovering unwanted observers, alerting co-conspirators to the presence of intruders, or warding off rival dealers or law enforcement agents. Neither man possessed any weapon, or any "electronic tracking device used to detect the presence of surveillance," *cf. United States v. Normandeau,* 800 F.2d 953, 955 (9th Cir.1986), or any form of communication such as a walkie-talkie, a mobile phone, or even a whistle. If their role was to engage in countersurveillance and act

---

**2.** Conflicting evidence was presented as to the identity of the person who attempted to flee. One government agent testified that the person who fled was Gonzalez–Villegas. Another testified that it was a separately-tried member of the Piar organization. Because we view the evidence in the light most favorable to the government and assume that the jury resolved all issues in support of the verdict, *United States v. Garza,* 980 F.2d 546, 552 (9th Cir.1992), we assume that Gonzalez–Villegas was the person who attempted to flee.

as enforcers, they were outstandingly ill-equipped for the task.

### 1. Evidence of Countersurveillance

The government's evidence regarding countersurveillance concerns the appellants' conduct during the drive to the undercover agents' hotel, where the agents were to purchase the five kilos of cocaine, and in the hotel parking lot while the transaction was consummated inside.

The appellants' truck drove closely behind that of the informant, who carried the cocaine. However, this is of minimal importance. Even in conjunction with the government's other evidence, it is not sufficiently probative of countersurveillance. Unlike the defendants in *United States v. Ocampo*, 937 F.2d 485, 487–88 (9th Cir.1991), for example, Ramos–Rascon and Gonzalez–Villegas did not "change[ ] lanes abruptly, enter[ ] a restaurant parking lot, and just s[i]t, not in any parking space, watching traffic.... ma[k]e U-turns, dr[i]ve up and down several streets, and stop[ ] to observe passing traffic." Instead, the appellants tailgated. This does not demonstrate more than an anxiety not to lose sight of the informant's truck.

Although the appellants' truck overshot the hotel entrance and drove into the lot at a different entrance than the informant's truck, its drive through the hotel parking lot is, at best, of only borderline significance. The appellants' truck did not "pass[ ] through [the] parking lot, ... circle[ ] back.... exit[ ] the lot, and proceed[ ] to make three laps

along the same route," as the countersurveillance vehicle did in *United States v. Mares*, 940 F.2d 455, 457 (9th Cir.1991). It drove directly to a parking spot near the front of the hotel, and parked. The movements of the truck are simply not unequivocal enough for us to say that the appellants were engaged in countersurveillance when they passed the hotel entrance and cut back through the parking lot.

The appellants' truck parked near the undercover agents' hotel room. This might be of more than minimal importance had the appellants stayed inside the truck, or had they left the truck's motor running after they got out. However, they did neither of these things—they parked the truck, meandered off, and finally sat on a wall, chatting and gazing around.

■ Finally, the appellants engaged in what the government characterizes as "hyper-vigilant" behavior: they rubbernecked during part of the drive to the hotel, and cast intent glances at passing cars as they lounged on the wall in the hotel parking lot and chatted desultorily.[3] We have found far more substantial evidence of countersurveillance to be insufficient to support a conviction. In *United States v. Cloughessy*, 572 F.2d 190 (9th Cir.1977), *discussed with approval, United States v. Penagos*, 823 F.2d 346, 350 (9th Cir.1987), we reversed the conviction of a defendant who followed two undercover Drug Enforcement Agency officers to a restaurant during a break in negotia-

---

**3.** Some of the government's evidence concerning the appellants' hyper-vigilance during the drive to the hotel is inherently improbable. The Drug Enforcement Agency officer who tailed their truck testified that, during part of the journey, he drove parallel to the truck, one block away, and that he could see the two men behaving in a "hyper-vigilant" manner while he was driving in this fashion. It simply defies logic to believe that a law enforcement agent can observe the extra degree of awareness the officer described here under these circumstances. Although we normally must accept the jury's implicit determinations of credibility, *United States v. Boone*, 951 F.2d 1526, 1536 (9th Cir.1991), we are permitted to disregard inherently improbable testimony. *Leonard v. United States*, 324 F.2d 911, 913 (9th Cir.1963). *See also United States v. Saunders*, 973 F.2d 1354, 1359 (7th Cir.1992) (the appellate court may reject evidence contrary to the laws of

nature or so inconsistent or improbable on its face that no reasonable factfinder could accept it); *United States v. Osum*, 943 F.2d 1394, 1405 (5th Cir.1991) (an appellate court may find testimony incredible as a matter of law if it asserts facts that the witness physically could not have observed or events that could not have occurred under the laws of nature). Accordingly, we disregard this portion of the officer's testimony.

The officer also testified that, when he was not driving one block away, he drove on the same street as the appellants' truck, tailing it at a distance, and that he observed the appellants' behavior then. Because we view the evidence in the light most favorable to the government and assume that the jury resolved all issues in a way that supports the verdict, *United States v. Garza*, 980 F.2d at 552, we may not disturb the jury's implicit adoption of this portion of his testimony.

tions over a narcotics transaction, drank beer there until the officers left, tailed one of the officers when he retrieved the purchase money for the deal, and reported his findings to the conspirators. Ramos–Rascon and Gonzalez–Villegas did no more than follow closely the truck ahead of them and look alertly around during part of the drive and while they waited in the parking lot. Neither man, for example, was posted at the hotel with orders to keep the members of the Piar organization informed of the actions of the cocaine "buyers." Neither man even arrived at the hotel early in order to satisfy himself that the "buyers" were not planning a trap. Instead, the two men followed the truck with the cocaine to the hotel.

In sum, the government's evidence of countersurveillance is simply insufficient to establish that Ramos–Rascon and Gonzalez–Villegas played a role in the conspiracy. Therefore, it is also insufficient to establish that their role was to act as lookouts and enforcers on behalf of the Piar organization.

### 2. Other Evidence of Participation in the Conspiracy

 The government also points to the fact that Ramos–Rascon and Gonzalez–Villegas were present when the proposed terms of the 200–kilo cocaine deal to be offered to the undercover agents were discussed among members of the Piar organization. However, the informant testified that neither man was ever present at any meeting between buyers and sellers. Moreover, he also testified that neither man was present at the meeting during which the date, time, and location of the deal were communicated to members of the organization. *Cf. United States v. Smith,* 962 F.2d 923, 926 (9th Cir.1992) (upholding conviction where appellant was present at and participated in such a conversation). Knowledge that a drug transaction might take place at an indefinite time in the future is not enough to show a connection to a conspiracy being carried out in the present. To connect the appellants to the charged transaction, we must infer that they knew that the buyers and sellers were consummating a *specific* drug transaction from the fact that they had heard the sellers propose *a*

drug transaction among themselves, in only general terms. The evidence does not permit us to draw such an inference. *Cf. United States v. Lopez,* 625 F.2d 889 (9th Cir.1980) (reversing the conviction of a defendant who spent the day with major drug conspirators, walked around the perimeter of their house after an occupant of the house peered out the window and out the door, drove to the scene of a drug deal with two of the principal conspirators, who carried 1.2 kilos of heroin and $5200 in cash, and told an arresting officer that he "knew what was going down" and that, but for a leg injury, he never would have been caught), *discussed with approval, United States v. Penagos,* 823 F.2d at 350; *United States v. Cloughessy,* 572 F.2d at 191.

Drawing every inference in the government's favor, we can say only that Ramos–Rascon and Gonzalez–Villegas were aware from the conversation that occurred in their presence that a drug deal might take place some time in the future, and that they may have suspected that a drug deal was occurring at the time of their arrest. "But th[is] permissible inference[ ] do[es] not support a holding that the government met its burden to prove beyond a reasonable doubt" that they knew that the transaction was imminent and that their actions were furthering it. *United States v. Wexler,* 838 F.2d 88, 92 (3d Cir.1988).

In addition, the government notes that, en route to the hotel where the drug deal was to take place, the informant and another conspirator, carrying the cocaine, discussed what would happen to the money they received for the drug. The other conspirator told the informant that some of the money would go to "Lopez and his people." The government contends that "Lopez" was Omar Stewart–Lopez, a member of the conspiracy riding in the truck with Ramos–Rascon and Gonzalez–Villegas, and that Ramos–Rascon and Gonzalez–Villegas were the "people" referred to. However, the speaker himself was named Romo–Lopez, and other members of the extensive conspiracy may also have had this common surname. Moreover, a Latino with a hyphenated surname is generally known by the first part of his surname, not the last part. Romo–Lopez would normally have re-

ferred to Stewart–Lopez as "Stewart," not as "Lopez." Finally, even if "Lopez" refers to Stewart–Lopez, it is far from clear that "his people" refers to Ramos–Rascon and Gonzalez–Villegas.

The last piece of evidence suggestive of guilt is Gonzalez–Villegas' attempted flight. However, even in conjunction with the other evidence, this is not enough to connect him to the conspiracy. *See United States v. Lopez, supra* (reversing the conviction of a defendant who told the arresting officer that, but for a leg injury, he would never have been caught). "Mere presence coupled with flight is not sufficient evidence to sustain a conspiracy conviction." *United States v. Ard,* 731 F.2d 718, 724 (11th Cir.1984) (citing *United States v. DeSimone,* 660 F.2d 532, 537 (5th Cir.1981), *cert. denied,* 455 U.S. 1027, 102 S.Ct. 1732, 72 L.Ed.2d 149 *and* 456 U.S. 928, 102 S.Ct. 1976, 72 L.Ed.2d 444 (1982)).

### 3. Conclusion

Although the evidence against Ramos–Rascon and Gonzalez–Villegas is strongly suggestive, it is not enough to show beyond a reasonable doubt that they were engaged in wrongdoing rather than in innocent behavior. *United States v. Vasquez–Chan,* 978 F.2d 546, 549 (9th Cir.1992). We find particularly persuasive *United States v. Bautista–Avila,* 6 F.3d 1360 (9th Cir.1993). There, we reversed, also on sufficiency grounds, convictions for the same offense of which Ramos–Rascon and Gonzalez–Villegas were convicted. Although the facts of *Bautista–Avila* are not identical to those of this case, the evidence as a whole was far more damning in that case than it is here: (1) The defendants in that case drove into the United States from Mexico only one minute apart from the car in which 24 kilos of cocaine were ultimately found. (2) On the day of the drug transaction, a conspirator retrieved the keys to the car carrying the cocaine from the motel room that one of the defendants had rented and in which both defendants, as well as a co-defendant, were staying. (3) On his arrest, a conspirator confessed to law enforcement officers that both the defendants' car and the other car were involved in the conspiracy. (4) One defendant admitted that he gave the second defendant $5000 "to hold." The second defendant admitted that he hid the $5000 in the dashboard of their car. Five thousand dollars was the exact amount that one of the conspirators was to receive for participating in the conspiracy. (5) Both defendants were arrested in the motel room where the drug transaction was to take place and directly in front of the place where both cars were parked. (6) Both defendants made various attempts to conceal their identity, including renting the motel room under an assumed name.

Although we found the evidence in *Bautista–Avila* probative of wrongdoing, we concluded the government did not show that either defendant *knew* of the conspiracy or acted in furtherance of it. Yet the evidence in *Bautista–Avila* is far stronger, far more suggestive of illegal activity, than that against Ramos–Rascon and Gonzalez–Villegas. The defendants in *Bautista–Avila* acted as custodians of the keys to the car where the cocaine was kept. By contrast, Ramos–Rascon and Gonzalez–Villegas were never given any access to the cocaine. The *Bautista–Avila* defendants hid a large sum of money in their own car—the exact sum that a conspirator was to be paid for his participation in the conspiracy. Here, neither Ramos–Rascon nor Gonzalez–Villegas ever saw or handled any money, and no evidence suggested that they received or expected to receive any payment for any of their acts. The *Bautista–Avila* defendants were circumstantially implicated by a conspirator's confession to law enforcement officers. No conspirator connected Ramos–Rascon or Gonzalez–Villegas to the drug transaction. Where the *Bautista–Avila* defendants stayed the night in close proximity to the conspirators in their case, nothing suggested that Ramos–Rascon or Gonzalez–Villegas spent more than a few hours in the company of the conspirators in theirs. Finally, the *Bautista–Avila* defendants were arrested inside the room where the drug transaction was to take place. Ramos–Rascon and Gonzalez–Villegas, however, never entered the room where the transaction was consummated.

Ramos–Rascon and Gonzalez–Villegas were arrested in "extremely incriminating

surroundings," *United States v. Ocampo,* 937 F.2d at 489 (quoting *United States v. Ramirez,* 880 F.2d 236, 238 (9th Cir.1989)). However, "the inferences rising from keeping bad company are not enough to convict a defendant for conspiracy," *United States v. Wexler,* 838 F.2d at 91 (citing *United States v. Cooper,* 567 F.2d 252, 255 (3d Cir.1977)). Their convictions for conspiracy to distribute cocaine must be reversed.

## C. Possession with Intent to Distribute

■ Possession with intent to distribute narcotics may be based on co-conspirator liability, aiding and abetting, or the exercise of dominion and control over the contraband. *United States v. Mares,* 940 F.2d at 460 (citations omitted).

### 1. Co–Conspirator Liability

■ Since insufficient evidence exists to show that the appellants were part of a conspiracy, their convictions cannot be supported on a theory of co-conspirator liability. *See United States v. Sanchez–Mata,* 925 F.2d at 1168.

### 2. Aiding and Abetting

■ To aid and abet, a defendant must "in some sort associate himself with the venture, ... participate in it as in something that he wishes to bring about, ... [and] seek by his action to make it succeed." *United States v. Vasquez–Chan,* 978 F.2d at 552 (quoting *United States v. Sanchez–Mata,* 925 F.2d at 1169). Mere participation in a criminal venture is not enough; the government must also show that the defendant "intentionally assisted in the venture's illegal purpose." *Id.* (quoting *United States v. Disla,* 805 F.2d 1340, 1352 (9th Cir.1986)).

■ Here, the government presented no evidence showing that either Ramos–Rascon or Gonzalez–Villegas knew that the drug transaction was taking place. They were not present when the day, time, or location of the transaction was fixed, or at any meeting between buyers and sellers. The government did not establish that either man knew that there *was* an illegal venture to aid and abet, or that either man intentionally helped to

carry out such a venture. Unlike the defendant in *United States v. Gillock,* 886 F.2d 220, 222 (9th Cir.1989), neither man possessed any drugs, drug paraphernalia, or weapons, and no testimony linked the men either to drug production or to drug distribution. Unlike the defendant in *United States v. Savinovich,* 845 F.2d 834, 838 (9th Cir. 1988), *cert. denied,* 488 U.S. 943, 109 S.Ct. 369; 102 L.Ed.2d 358 (1988), neither man carried the drugs to the informant's truck, or from the truck to the agents' hotel room. Unlike the defendant in *United States v. Valles–Valencia,* 811 F.2d 1232, 1235 (9th Cir.1987), *modified,* 823 F.2d 381 (9th Cir. 1987), neither man was seen in the same room as the drugs, nor were their fingerprints found on any item associated with drug possession or drug distribution, nor were they present when the cocaine was wrapped, retrieved, or exchanged. Under these circumstances, we cannot say beyond a reasonable doubt that they are guilty of possession with intent to distribute, even on an aiding and abetting theory.

### 3. Dominion and Control

■ Because neither Ramos–Rascon nor Gonzalez–Villegas ever had actual possession of the cocaine, the government relies on a theory of constructive possession to establish dominion and control. Constructive possession may be demonstrated by a defendant's "authority to dispose of the drug, either personally or through an agent." *United States v. Smith,* 962 F.2d at 929. Here, nothing suggests that Ramos–Rascon and Gonzalez–Villegas had authority to dispose of the drug personally; no evidence suggests that they had access to the cocaine or even knew where it was to be found. Moreover, because we have held that insufficient evidence exists to support the two men's convictions for conspiracy, we cannot find that any member of the Piar organization acted as their agent in delivering the cocaine to the undercover government agents.

■ Alternatively, constructive possession may be shown by a defendant's participation in a joint venture, by which he shares authority with others to exercise dominion and control over the drug. *Id.*

While coordinated activity among defendants raises an inference of a joint venture, the government must show more than that the defendant associated with drug conspirators. It must show that the defendant assisted in directing or planning the acquisition or transportation of the drugs, or that, as a result of the transaction, he acquired an ownership interest in them. *Id.* at 930. Here, the government did not show that the two men had any connection whatever to the acquisition of the cocaine or that they assisted in directing or planning its transportation. *Cf. Arellanes v. United States,* 302 F.2d 603 (9th Cir.1962) (finding no constructive possession where drugs were found at the home of a married couple, where heroin and marijuana were discovered in the rear seat of their car, which they were driving at the time they were stopped and searched, and where, on arrest, the wife said to a friend, "I'll bet you didn't know you were sitting on fifty pounds of weed"), *cert. denied,* 371 U.S. 930, 83 S.Ct. 294, 9 L.Ed.2d 238 (1962), *discussed with approval, United States v. Disla,* 805 F.2d at 1351; *United States v. Penagos, supra* (finding no constructive possession although the defendant, according to the government, both acted as the lookout for drug conspirators as cocaine was loaded into the trunk of a car and accompanied a co-defendant to the site of a drug deal).

■ Finally, constructive possession may be demonstrated circumstantially by the defendant's special relationship to those who directly control the narcotics. *United States v. Ocampo,* 937 F.2d at 489. For example, in *United States v. Hernandez,* 876 F.2d 774, 778 (9th Cir.1989), we found that Hernandez had constructive possession of narcotics "particularly in light of the evidence of [his] relationship" with his co-defendant girlfriend, an undisputed drug-dealer, and in light of the fact that during the week he lived in her apartment, keeping his clothing in the bedroom closet where the cocaine was found.

Here, in contrast, no long-term or familial relationship was shown between either man and any member of the Piar organization, although several members of the organization were related to one another. *Compare United States v. Lopez, supra* (reversing conviction where defendant was unrelated to conspirators, many of whom were related to one another), *with United States v. Savinovich, supra* (upholding a conviction where the defendant was married to a co-defendant).

■ A defendant who constructively possesses narcotics has the "ability to assure [their] production, without difficulty, to a customer." *United States v. Disla,* 805 F.2d at 1352 (quoting *United States v. Batimana,* 623 F.2d 1366, 1369 (9th Cir.1980); internal quotations omitted). Here, nothing suggests that either Ramos–Rascon or Gonzalez–Villegas ever saw or handled the drugs, knew where they were stored, transported them, owned them, or was paid for them. Their convictions for possession with intent to distribute must be reversed.[4]

\* \* \*

This is the type of case in which a court must recognize that the persons to be released may well be guilty of the offenses charged. However, the plain fact is that the case against these defendants was not proved beyond a reasonable doubt. That a defendant is *probably* guilty is not enough.

Our system works well. We can be proud of the safeguards that protect the innocent, even though they sometimes allow a guilty person to go free. No system can ensure accurate results in all cases; we learned long ago that it is better to err on the side of caution than to convict an innocent person. That historic wisdom remains true today, notwithstanding the current willingness to abandon constitutional protections in order to

---

4. Concurrent with this opinion, we file a memorandum disposition in the companion case of *United States v. Stewart–Lopez,* 9 F.3d 1555. There, we affirm the convictions of a separately-tried conspirator who was charged with the same offenses as Ramos–Rascon and Gonzalez–Villegas. The evidence in that case supported the inference of a rational jury that the defendant was guilty beyond a reasonable doubt. That defendant participated in a discussion during which the precise location and time of the five-kilo cocaine transaction were decided upon, and $1300 in serialized currency from the one-kilo transaction were found in his wallet after his arrest.

further the seemingly endless and potentially futile war on drugs.

**REVERSED.**