66 F.3d 337
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Salvador SANCHEZ-CERVANTES, Defendant-Appellant.
 No. 93-10701.
 United States Court of Appeals, Ninth Circuit.
 Submitted July 10, 1995.*
Decided Sept. 7, 1995.
 
 1
 Before: CANBY, FERNANDEZ, Circuit Judges, and FITZGERALD**, District Judge.
 
 
 2
 MEMORANDUM***
 
 
 3
 Salvador Sanchez-Cervantes ("Sanchez") appeals his jury conviction and sentence under the Sentencing Guidelines for conspiracy to distribute and to possess with intent to distribute cocaine, possession of cocaine with intent to distribute, use of a firearm during a drug trafficking crime, and being a felon in possession of a firearm, in violation of 21 U.S.C. 841(a)(1), 846, 18 U.S.C. Secs. 922(g)(1) and 924(c)(1) respectively. We have jurisdiction under 28 U.S.C. Sec. 1291 and we affirm.
 
 I. SUFFICIENCY OF THE EVIDENCE
 A. Background
 
 4
 The trial evidence demonstrated that Detective Canuto Garza, an undercover officer in the Tulare County Sheriff's Office, first met Eduardo Corrales on October 8, 1992. On October 19, 1992, Corrales told Detective Garza that he had contacted a friend in Tracy, California, who could sell five kilograms of cocaine at Corrales' house. The price would be $17,000 per kilo, plus an additional $1,000 per kilo for Corrales.
 
 
 5
 On the morning of October 22, 1992, Corrales telephoned Garza and said that "his people" were on their way to his house. Early that afternoon, Corrales told Garza that "his people" had arrived with the cocaine. At the same time, police conducting surveillance of Corrales' home noted that Gustavo Nunez's white Buick and Salvador Sanchez's brown Mazda were parked in front of the house.
 
 
 6
 Nunez had previously called Corrales and told him that everything was ready and that he would bring the cocaine to Corrales' house. Sanchez and Miguel Quinones arrived separately from Nunez in Sanchez's Mazda and introduced themselves to Corrales. Corrales invited the three men into his home and offered them a beer while they waited for Garza to arrive.
 
 
 7
 While waiting in Corrales' house, Nunez explained that Sanchez was in charge of the merchandise. Corrales then asked Sanchez about acquiring more cocaine for future deals with Garza. Sanchez questioned Corrales about Garza's truthworthiness. Quinones and Nunez were both present during these conversations.
 
 
 8
 Around 5:00 p.m., Detective Garza called Corrales and asked to meet him at the K-Mart parking lot in Merced, California. Because Corrales, Nunez, Sanchez, and Quinones expected the deal to take place at Corrales' home, Corrales and his wife Georgette drove to the K-Mart in their red Geo expecting to return with Detective Garza. Once they arrived, Detective Garza asked Corrales to bring one kilogram of cocaine to the parking lot. Georgette returned home to retrieve it.
 
 
 9
 Georgette returned to her house and told Nunez, Sanchez, and Quinones that Corrales had asked her to bring a sample of the cocaine to the K-Mart parking lot. One of the men then went into the house and retrieved a toolbox that Georgette had earlier seen Nunez unload from his car.
 
 
 10
 Nunez and Georgette drove in the red Geo transporting the toolbox. Quinones and Sanchez drove in Sanchez's brown Mazda. The Mazda followed the red Geo toward the K-Mart parking lot. As the cars approached the parking lot, the red Geo drove into the parking lot while the brown Mazda drove past the parking lot, turned around, and then drove past the parking lot again.
 
 
 11
 After Georgette and Nunez arrived, Garza asked Nunez if he had the kilogram of cocaine. Nunez responded that the cocaine was in a toolbox behind the seat. Garza opened the toolbox, saw the cocaine, and gave the arrest signal.
 
 
 12
 Once the arrest signal was broadcast, a police surveillance unit began pursuit of the brown Mazda, which was driven backwards down a street and through an intersection at approximately 25-30 miles per hour. The Mazda then made a U-turn and entered onto Highway 99, ignoring stop signs along the way. As the Mazda proceeded down Highway 99 it traveled 50-55 miles per hour in the fast lane, then 45-50 miles per hour in the slow lane. The passenger in the Mazda threw a paper bag out the window while the vehicle was in the fast lane, and then threw a handgun and another object out the window after the Mazda moved into the slow lane.
 
 
 13
 Eventually, the Mazda left the highway at Turlock and entered a restaurant parking lot where the occupants were arrested. Sanchez was removed from the driver's side of the Mazda and Quinones was removed from the passenger side.
 
 
 14
 Officers searching the side of Highway 99 found a Beretta 9mm semiautomatic, fully loaded with the hammer down. Officers also found a .22 semi-automatic handgun, also loaded.
 
 B. Analysis
 
 15
 Sanchez maintains that the evidence was insufficient to support his convictions. We will find sufficient evidence to support a conviction if, reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Lennick, 18 F.3d 814, 819 (9th Cir.), cert. denied, 115 S.Ct. 162 (1994).
 
 1. Conspiracy to Distribute Cocaine
 
 16
 To prove a conspiracy, the government must show an agreement to accomplish an illegal objective and the requisite intent necessary to commit the underlying offense. United States v. Shabani, 115 S.Ct. 382 (1994). Sanchez does not dispute that a conspiracy to distribute and possess cocaine existed. Rather, he argues that the government failed to prove that he knew a cocaine transaction was underway and that he acted to support it.
 
 
 17
 "Once the existence of a conspiracy is established, evidence of only a slight connection to the conspiracy is necessary to support a conviction of knowing participation in that conspiracy." United States v. Ramos-Rascon, 8 F.3d 704, 707 (9th Cir.1993) (quotations omitted).
 
 
 18
 Sanchez argues that his case is controlled by Ramos-Rascon, a case in which this court reversed a conspiracy conviction. The appellants in Ramos-Rascon rode in a truck that followed closely behind the truck transporting the drugs. The appellants looked alertly around as they drove. Their truck overshot the entrance of the parking lot of the hotel where the deal was to take place, re-entered the lot at another entrance, and drove back through the lot, parking near the undercover agents' room. The appellants sat on a wall outside the hotel, "chatting desultorily," and watching passing cars intently, as the deal was consummated inside. One of the appellants tried to run away when pursued. Ramos-Rascon, 8 F.3d at 704.
 
 
 19
 The government's theory in Ramos-Rascon was that the appellants were engaged in countersurveillance. But the Ramos-Rascon opinion notes that although the government's own witnesses stated that "those engaged in countersurveillance for drug dealers commonly possess weapons and communicative devices," and the appellants in that case had neither weapons nor communicative devices. Id. In contrast, the evidence in this case strongly suggests that Sanchez and Quinones possessed two fully-loaded semi-automatic weapons. The evidence of the firearms dramatically distinguishes this case from Ramos-Rascon. United States v. Segura-Gallegos, 41 F.3d 1266 (9th Cir.1994) (distinguishing Ramos-Rascon on the basis that defendant was in possession of a firearm).
 
 
 20
 We conclude the evidence in the present case point to more than Sanchez's "mere causal association with conspiring people." United States v. Bautista-Avila, 6 F.3d 1360, 1363 (9th Cir.1993). Instead, we find sufficient evidence to support Sanchez's conspiracy conviction because, viewed in the light most favorable to the government, a reasonable jury could have found evidence beyond a reasonable doubt of Sanchez's participation in the conspiracy.
 
 
 21
 2. Possession of Cocaine with Intent to Distribute
 
 
 22
 A conviction for possession with intent to distribute narcotics may be based on one of three legal theories: (1) co-conspirator liability; (2) aiding and abetting; and (3) exercising dominion and control over the contraband. United States v. Sanchez-Mata, 925 F.2d 1166, 1168-1169 (9th Cir.1991).
 
 
 23
 As we concluded, the government presented sufficient evidence to convict Sanchez of conspiracy to distribute cocaine. Thus, he is liable for the acts committed by his co-conspirators under a Pinkerton theory. Pinkerton v. United States, 328 U.S. 640, 645-47 (1946); United States v. Mares, 940 F.2d 455, 460 (9th Cir.1991) (countersurveillance activities qualify as acts in furtherance of a conspiracy). It is undisputed that Sanchez's co-defendants possessed cocaine with intent to distribute. Thus, having affirmed his conspiracy conviction, we also affirm Sanchez's conviction for possession of cocaine with intent to distribute.[1]
 
 II. RETURN OF THE GRAND JURY INDICTMENT
 
 24
 Sanchez argues that the district court lacked jurisdiction because the government failed to return the indictment in open court. On December 3, 1992 the grand jury returned a superseding indictment against Sanchez in a cleared and closed courtroom. This objection to the indictment was not raised prior to trial.
 
 
 25
 Under Rule 12(f) of the Federal Rules of Criminal Procedure, "[f]ailure by a party to raise defenses or objections or to make requests which must be raised prior to trial ... shall constitute a waiver thereof...." Federal Rule of Criminal Procedure 12(b)(2) provides that all "[d]efenses and objections based on defects in the indictment or information" must be made before trial. Rule 12(b)(2) further states, however, that objections to the jurisdiction of the court may be raised at any time during the pendency of the proceedings." Jurisdictional claims permitted under Rule 12(b) include allegations that "the applicable statute is unconstitutional or that the indictment fails to state an offense." United States v. Montilla, 870 F.2d 549, 552 (9th Cir.1989).
 
 
 26
 Sanchez's claim is not a jurisdictional claim as he neither challenges the constitutionality of the statutes under which he was charged, nor does he claim that the indictment failed to state an offense. See United States v. Kahlon, 38 F.3d 467, 469 (9th Cir.1994). Because Sanchez objects to a procedural defect in the entry in the indictment, and he did not raise this defect until after trial, Rule 12(b)(2) precludes him from raising this issue on appeal. Accordingly, we decline to hear Sanchez objection to the manner in which the indictment was returned.
 
 
 27
 Sanchez cites Renigar v. United States, 172 F. 646, 650 (4th Cir.1909), for the proposition a valid indictment must be returned in open court and that failure to do so is a jurisdictional claim. This court recently rejected Renigar in United States v. McChristian, 47 F.3d 1499, 1504-05 (9th Cir.1995) (following United States v. Linnick, 18 F.3d 814 (9th Cir.), cert. denied, 115 S.Ct. 162 (1994), and employing harmless error analysis to the procedural defect). Thus, even if we were to reach this issue, the return of the indictment would be harmless error. See United States v. Oliver, No. 93-10770, slip op. at 7848-49 (9th Cir. July 6, 1995) (return of indictment in closed courtroom harmless error).
 
 
 28
 III. COMPOSITION OF THE GRAND AND PETIT JURY VENIRES
 
 
 29
 Sanchez adopts the argument of his codefendant, Miguel Quinones, that the venires from which the petit and grand juries were drawn underrepresented Hispanics. We adopt the findings and conclusions reached by the panel hearing Miguel Quinones appeal as the law governing this case and therefore uphold the jury selection procedure employed in the Eastern District of California.[2]
 
 IV. CONCLUSION
 
 30
 We find that there was sufficient evidence to support Sanchez's conviction for conspiracy to distribute and possess cocaine with intent to distribute, and the use of a firearm during a drug trafficking crime. We also find that the district did not lack jurisdiction for the manner in which the grand jury indictment was returned. And finally, we find that Sanchez failed to present adequate evidence to support a finding that the jury selection procedure in the Fresno division of the Eastern District of California violated his Sixth Amendment, statutory, or equal protection rights.
 
 
 31
 AFFIRMED.
 
 
 
 *
 This panel unanimously finds this case suitable for decision without oral argument. Fed.R.App.P. 34(a) and Ninth Circuit Rule 34-4
 
 
 **
 The Honorable James M. Fitzgerald, Senior U.S. District Judge for the District of Alaska, sitting by designation
 
 
 ***
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Aside from generally contending that he did not participate in the conspiracy, Sanchez does not directly challenge the sufficiency of the evidence with regard to his conviction for carrying a firearm during a drug trafficking crime. We note, however, that the evidence was sufficient to support his conviction on this charge. See United States v. Torres-Medina, 935 F.2d 1047, 1048-49 (9th Cir.1991) (sufficient evidence exists where defendant, who was a paraplegic confined to a wheelchair, owned a loaded gun found next to cocaine in a crawl space beneath the defendant's house)
 
 
 [2]
 United States v. Quinones, No. 93-10751, 1995 WL 29500 (9th Cir. Jan. 25, 1995)