**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES, | No. 06-10076 |
| Plaintiff-Appellee, | D.C. No. CR-03-00156-WHA |
| v. | |
| EFREN RODRIGUEZ, | MEMORANDUM[*] |
| Defendant-Appellant. | |

Appeal from the United States District Court
for the Northern District of California
William H. Alsup, District Judge, Presiding

Argued and Submitted October 9, 2009
San Francisco, California

Before: SCHROEDER and BERZON, Circuit Judges, and SHADUR,[**] District
Judge.

---

[*]     This disposition is not appropriate for publication and is not precedent
except as provided by 9th Cir. R. 36-3.

[**]     The Honorable Milton I. Shadur, Senior United States District Judge for the
Northern District of Illinois, sitting by designation.

Efren Rodriguez ("Rodriguez") appeals (1) his criminal conviction, after a jury trial, on eight counts of aiding and abetting possession, with the intent to distribute, methamphetamine (hereafter referred to by the colloquial term "meth") and one count of maintaining a drug-involved premises and (2) his resulting sentence. We affirm.

**Background**

Rodriguez was tried and convicted of the above-described eight meth-related counts in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2[1] (Counts Eight to Fifteen) and one count of maintaining a drug-involved premises in violation of 21 U.S.C. § 856 (Count Sixteen). He was sentenced to 108 months' concurrent imprisonment on each count, followed by five years' supervised release, and was also ordered to pay a special assessment of $900 and a $20,000 fine.

Between November 30, 2001 and May 20, 2003 Rodriguez owned the Puerto Vallarta Restaurant in Santa Rosa, California. Unknown to him, one of his customers, Jesus Ontiveros Castillo ("Castillo"), was a confidential informant for the Drug Enforcement Administration ("DEA"). Before April 2002 Castillo and Rodriguez had conversations in which Rodriguez told Castillo that he could

---

[1] Further citations to Title 18 provisions will take the form "Section –,"omitting the prefatory "18 U.S.C."

2

arrange a meeting to introduce Castillo to someone who could supply him with drugs.

Beginning in April 2002 Rodriguez introduced Castillo to a number of drug suppliers, starting with Carlos Dominguez ("Dominguez"). After Castillo had bought some drugs from Dominguez he complained to Rodriguez that Dominguez had raised his prices. Rodriguez reassured him that Dominguez's prices would improve once he got to know Castillo better and began to trust him. Castillo then introduced Rodriguez to Charles Vallejo ("Vallejo"), an undercover DEA agent (again a status unknown to Rodriguez), and Vallejo complained that Dominguez was unreliable. He asked Rodriguez to introduce him to other suppliers, and Rodriguez said he would. In all Castillo purchased drugs from Dominguez three times, twice alone and once with Vallejo.

Over the next several months Rodriguez also introduced Castillo and Vallejo to Jose Cisneros ("Cisneros") and, later, to Francisco Fernandez ("Fernandez"), both suppliers of meth. After Rodriguez had introduced them to Cisneros, Castillo and Vallejo arranged to meet Cisneros at Rodriguez's restaurant to complete a drug deal. Castillo and Vallejo arrived and told Rodriguez that Cisneros wasn't returning their phone calls. Rodriguez became angry and called Cisneros to tell him that they were waiting and that he should come to the restaurant. Cisneros

3

eventually arrived and sold Castillo and Vallejo drugs. Later, on another occasion, he also sold them meth at Rodriguez's restaurant.

Rodriguez also put Castillo and Vallejo in touch with Fernandez and acted as a conduit for information for Fernandez, who did not want Castillo and Vallejo to have his phone number.[2] Rodriguez regularly passed messages between Castillo and Fernandez about their respective desires to speak or meet with each other. Eventually Fernandez sold Castillo a pound of meth and arranged to sell him another pound.

In February 2003 Rodriguez spoke to Castillo and warned him to be careful in dealing with Cisneros because he had recently used fake money to rip off a friend of his. Later that month Rodriguez gave Castillo contact information for Aaron Hernandez ("Hernandez") and told him that Hernandez was well connected. Rodriguez told Castillo that he had vouched for him to Hernandez, that Hernandez was interested in working with Castillo and that Hernandez was the friend to whom Cisneros had paid fake money. In response Castillo told Rodriguez to inform Hernandez that he should expect a call from Castillo. Later, at the end of February, Castillo met Hernandez in person at Rodriguez's restaurant, where the two men

---

[2] Although Rodriguez vouched for Castillo and Vallejo, Fernandez told Rodriguez to give them only his pager number.

discussed drug quantities and prices and Hernandez agreed to sell Castillo five pounds of meth.

In the beginning of March 2003 and before the exchange of those drugs, Hernandez was arrested for an outstanding probation violation warrant at the agreed-upon exchange location. His car was searched and five pounds of meth were seized. Rodriguez was arrested on June 4, 2003. After he was advised of his rights, he said that he was "playing around with Jesus" and "that he might have introduced Jesus to people, and they possibly dealt drugs at the restaurant."

Before Rodriguez's trial the government filed an *in camera* declaration advising the district court of its investigation into asserted witness intimidation by Hernandez, one of Rodriguez's co-defendants. Rodriguez's counsel sought disclosure of the declaration, but the court refused based on what it considered valid security reasons. Instead the court told defense counsel that Hernandez had attempted to intimidate two witnesses into testifying that they had received drugs from Rodriguez. Both witnesses said they would not so testify and reported the incidents to the government. Although the court ordered the government to disclose the names of those two witnesses, it ruled that defense counsel was not entitled to further information other than what could be elicited in cross-examining the witnesses during trial. Only one of the two witnesses testified, and Rodriguez's

5

counsel did not ask any questions about Hernandez's intimidation.

During the sentencing hearing of Rodriguez's co-defendant Dominguez, the latter's counsel revealed that Dominguez had also been intimidated by Hernandez and had actually been assaulted by Hernandez in prison. Dominguez was not one of the two witnesses whom the government had investigated earlier. As the government explained, it was not aware of the prison assault before Dominguez's sentencing hearing.

After the trial and before Rodriguez's sentencing hearing, both defense counsel and the government filed sentencing memoranda that explained that the 2002 Sentencing Guideline ("Guideline") manual capped Rodriguez's base offense level at 30 if he qualified for a mitigating role adjustment, while the 2005 Guideline manual (in effect at the time of his sentencing) did not impose such a cap. At the sentencing hearing the district court asked what the effect would be of a finding that Rodriguez was entitled to a mitigating role adjustment as to the drug sales counts but not as to his maintenance of a drug-involved premises. Government counsel responded that the base offense level would not be capped at 30, because the court should consider only the base offense level for the highest-ranked offense.

After the conclusion of Rodriguez's sentencing hearing, the court calculated

6

his total offense level as 30 as to the drug possession and distribution counts. It started with a base offense level of 36 based upon the quantity of drugs, subtracted two levels for Rodriguez's minor role, two levels under the safety valve provision and another two levels for acceptance of responsibility. As for the conviction for maintaining a drug-involved premises, the court calculated the total offense level for that charge to be 31. It started with a base level of 34, and it subtracted two levels for acceptance of responsibility and granted a one level downward departure because Rodriguez had not transported the drugs, negotiated the terms of sale or profited directly from the transactions (the court did not grant a reduction for Rodriguez's minor role, stating that "[h]e was not a minor player in connection with what happened in his restaurant").

With a total offense level of 31 (the higher of the two end figures), the court determined the applicable guideline range to be 108 to 135 months. After considering the Section 3553(a) factors, the court sentenced Rodriguez to 108 months' imprisonment.

### *Brady* Violation Claims

We review *de novo* the district court's ruling on the government's duty to produce evidence pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) (see, e.g., *United States v. Ross*, 372 F.3d 1097, 1107 (9th Cir. 2004)). Rodriguez claims two

7

*Brady* violations.

First, he contends that the government failed to disclose evidence of, or to inform Rodriguez of, Hernandez's prison attack on Dominguez. Second, he claims that the district court erred in refusing to order disclosure of the government's declaration regarding its investigation into the pretrial threats made by Hernandez against two witnesses. Rodriguez argues that without those two disclosures he could not effectively confront the government's witnesses or effectively advance a duress defense.[3] As he puts it, the government's failure to learn of the attack before Dominguez's sentencing hearing "calls into question the entire scope of the pretrial investigation and the government's true efforts to seek justice in this case."

*Brady*, 373 U.S. at 87 holds "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady's duty to disclose has been extended to apply even in the absence of a specific request by an accused (*United States v. Agurs*, 427 U.S. 97, 107 (1976)) and to encompass impeachment as well as

---

[3] Rodriguez argued at trial that Castillo's telling Rodriguez that he was a member of the Mexican Mafia intimidated and scared him.

exculpatory evidence (*United States v. Bagley*, 473 U.S. 667, 676 (1985)).

*Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) instructs that three requirements must be met to establish a *Brady* violation:

> The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

Evidence is considered material under *Brady* "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different" (*Bagley*, 473 U.S. at 682).

*United States v. Blanco*, 392 F.3d 382, 388 (9th Cir. 2004), quoted this teaching from *United States v. Zuno-Arce*, 44 F.3d 1420, 1427 (9th Cir. 1995):

> Exculpatory evidence cannot be kept out of the hands of the defense just because the prosecutor does not have it, where an investigating agency does. That would undermine *Brady* by allowing the investigating agency to prevent production by keeping a report out of the prosecutor's hands until the agency decided the prosecutor ought to have it, and by allowing the prosecutor to tell the investigators not to give him certain materials unless he asked for them.

That principle echoes the holding of *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."

Despite his protestations to the contrary, those cases do not at all support

9

Rodriguez's claim of a *Brady* violation as to Hernandez's attack on Dominguez. First, Rodriguez fails to show that the evidence of Dominguez's attack would have been exculpatory or impeaching so as to benefit his defense. As the district court noted when it rejected Rodriguez's request for disclosure of the government's declaration, the facts (1) that witnesses were threatened by Hernandez and refused to lie about the sources of drugs and (2) that Dominguez was physically assaulted for that decision do more to bolster those witnesses' credibility than to impeach them. Moreover, Dominguez did not testify at Rodriguez's trial, so that by definition any evidence of his intimidation by Hernandez could not be used for impeachment.

Second, even under *Blanco* and *Kyles* there is no indication that the evidence of Dominguez's attack had been suppressed--either willfully or inadvertently--by the government. Although those cases do charge the government with knowledge of information in the hands of other investigating agencies, including the police, Rodriguez makes no showing that the other relevant law enforcement agency in this case--the DEA--was aware of the attack on Dominguez. Instead Rodriguez contends that because *some* law enforcement agency must have known about the attack (presumably the prison officials at the correctional facility where the attack took place), the government should have discovered that information and provided

10

it to Rodriguez.

That argument would stretch the holdings of *Blanco* and *Kyles* too far. *Brady* and its progeny do not impose a duty on a prosecutor to learn of or search for information in the possession of agencies that are not at all involved in the government's investigation or prosecution. Because the government did not learn of Dominguez's attack until his sentencing--a fact that Rodriguez does not dispute--and because it had no duty to seek out such information, it simply cannot be said that the information was suppressed by the government.

Finally, Rodriguez's *Brady* claim with respect to the attack on Dominguez fails independently because Rodriguez cannot establish a reasonable probability that if evidence of it had "been disclosed to the defense, the result of the proceeding would have been different" (*Bagley*, 473 U.S. at 682). As already stated, Rodriguez could not use such evidence for "impeachment" purposes as to non-witness Dominguez. Moreover, any claim that the information would have supported Rodriguez's duress defense is unpersuasive. Rodriguez's counsel argued at trial that his client introduced Castillo to various drug suppliers because he was scared and fearful of Castillo, who introduced himself as a member of the Mexican Mafia, a highly dangerous criminal enterprise. But that argument is not in any way supported or aided by evidence that Hernandez threatened or

11

intimidated Rodriguez's co-defendants before trial.

Rodriguez's other *Brady* claim--that regarding the government's declaration--fails for much the same reason as the first. There is no indication that the declaration contained any exculpatory or impeachment evidence. Defense counsel was informed of the identity of the two witnesses who had been approached by Hernandez to change their stories--but as the district court observed, that information itself had no impeachment or exculpatory value to Rodriguez. That is further confirmed by his own counsel's failure to cross examine the one testifying witness who had been subjected to the threats. Similarly, because there has been no showing that any information in the government's declaration would have been helpful to Rodriguez, he cannot be found to have suffered prejudice from its nondisclosure. Accordingly, we hold that Rodriguez has not suffered any violation of due process in *Brady* terms.

## Claimed Insufficiency of Evidence

Rodriguez made an oral motion for judgment of acquittal pursuant to Fed. R. Crim. P. ("Rule") 29 after the government rested its case. That motion was denied by the district court after hearing argument. Then after the jury returned its verdict, Rodriguez renewed his Rule 29 motion and, pursuant to a briefing schedule set by

the court, filed his written motion for acquittal.[4]

We review *de novo* a district court's denial of a motion for judgment of acquittal based on the alleged insufficiency of evidence (*United States v. Hardy*, 289 F.3d 608, 612 (9th Cir. 2002). That review is conducted in the same way as a sufficiency challenge--by determining, with the evidence viewed in the light most favorable to the government, "whether any rational trier of fact could have found, beyond a reasonable doubt, the requisite elements of the offense charged" (*United States v. Mendez-Casillas*, 272 F.3d 1199, 1203 (9th Cir. 2001)).

As stated at the outset, Rodriguez was convicted of eight counts of aiding and abetting the possession with intent to distribute meth in violation of 21 U.S.C. § 841(a) and Section 2. To be convicted of aiding and abetting, Rodriguez "must have knowingly and intentionally aided and abetted the principals in each essential element of the crime. This assistance must be rendered while the crime is still in progress" (*United States v. Dinkane*, 17 F.3d 1192, 1196 (9th Cir. 1994)).

Rodriguez argues that the government's evidence was insufficient to support his aiding and abetting conviction. Although he acknowledges that he acted as a

---

[4] Rodriguez also filed a Rule 33 motion, but his arguments on appeal focus exclusively on the Rule 29 motion and the sufficiency of evidence presented by the government. We therefore do not consider any alternative grounds for a new trial, for Rodriguez has clearly not met his burden in that regard.

13

"matchmaker" between Castillo and potential drug suppliers, he contends that he was not aware that any specific drug transactions were taking place, was not present at any of the transactions, did not intentionally help carry out any drug transactions and never possessed any drugs or had any ties to the chain of drug distribution.

That argument is a total non-starter. Rodriguez did far more than just introduce drug suppliers to Castillo and Vallejo. He provided assurances to them regarding the price of Dominguez's drugs, he called Cisneros when the latter failed to show up for a previously arranged meeting with Castillo and Vallejo at Rodriguez's restaurant, he warned Castillo about dealing with Cisneros, he provided assurances to Fernandez about Castillo's reliability, he called Fernandez to arrange meetings between Fernandez and Castillo and he told Hernandez that Castillo was a reliable and consistent buyer.

In short, Rodriguez was the linchpin that linked together all of the actual and proposed drug deals, serially producing what must have seemed a virtually inexhaustible source of supply. And his choosing to absent himself from the face-to-face meetings of the drug suppliers and buyers (like the proverbial monkey who covers his eyes so he can claim to see no evil) makes not a particle of difference as to his aider and abetter liability. It cannot reasonably be disputed that Rodriguez

14

wished to bring the drug transactions about and to see them succeed, and that is enough.

Rodriguez's attempted reliance on factors considered in *United States v. Ramos-Rascon*, 8 F.3d 704, 711 (9th Cir. 1993) is misplaced. As an initial matter, nowhere in *Ramos-Rascon* does the court, in analyzing the defendant's aiding and abetting conduct there, suggest that the factors it considers are somehow preconditions to the establishment of aider and abettor liability in all cases. But more importantly, the involvement (more accurately, the non-involvement) of the defendants in the drug transactions at issue there differs markedly from Rodriguez's vital involvement in this case. In *Ramos-Rascon* the evidence suggested that the defendants at most served as lookouts outside of a hotel during a drug deal (*id*. at 708-09). Wholly unlike the evidence as to Rodriguez, there was no evidence that those defendants knew what was taking place in the hotel room or that the transaction even involved drugs (*id*. at 711).[5]

Rodriguez also contends that there was insufficient evidence to support his conviction for maintaining a drug-involved premises in violation of 21 U.S.C. §

---

[5] Rodriguez's arguments as to the lack of evidence that he actually possessed or distributed any drugs are also unavailing. Nothing more than the common-sense meaning of "aiding and abetting" is needed to confirm that Rodriguez need not have possessed meth, either actually or constructively, to be found guilty of aiding and abetting others in their possession with intent to distribute that drug.

15

856(a)(2). But it is not necessary under that section to show that Rodriguez deliberately maintained his restaurant for the purpose of drug activity. Instead that section "was intended to prohibit an owner from providing a place for illegal conduct, and yet to escape liability on the basis either of lack of illegal purpose, or of deliberate ignorance" (*United States v. Tamez*, 941 F.2d 770, 774 (9th Cir. 1991)).

Rodriguez admits that he managed and controlled the Puerto Vallarta restaurant and that the property was available to others, but he urges that the government presented no evidence that he knowingly and intentionally made the restaurant available for the purpose of drug activity. That position flies in the face of all the evidence. Rodriguez used his restaurant to introduce Castillo and Vallejo to each drug supplier, and he clearly knew that meetings between Castillo and Vallejo and those suppliers took place at his restaurant. In fact, Rodriguez himself called Cisneros and told him to come to the restaurant after Castillo complained that they had previously agreed to meet there and he could not reach Cisneros.

In sum, none of Rodriguez's efforts to escape criminal responsibility carries any weight. It is really an understatement to say that his guilt on all counts has been proved beyond a reasonable doubt.

**Sentencing Issues**

We review sentencing decisions for procedural and substantive reasonableness under an abuse of discretion standard (*United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008)). Because Rodriguez expressly contested which Guideline manual should control before the district court, the government's contention that the question should be reviewed for plain error (*United States v. Benitez-Perez,* 367 F.3d 1200, 1205 (9th Cir. 2004)) is incorrect, while Rodriguez acknowledges that his challenge to the quantity of drugs to be considered (raised for the first time before us) calls for clear-error review of that issue (*United States v. Dallman*, 533 F.3d 755, 760 (9th Cir. 2008)).

Rodriguez first contends that the district court erred by sentencing him under the 2005 rather than the 2002 Guideline manual, pointing to the well-established principle that "[a] district court must apply the version of the Sentencing Guidelines in effect on the date of sentencing, unless that would pose an ex post facto problem" (*Benitez-Perez*, 367 F.3d at 1205). If punishment under the later version of the Guidelines would be more severe than it would have been at the time the crime took place, a defendant must be sentenced under the version in effect when he committed the offense.

Rodriguez contends that his sentence violates the ex post facto prohibition

because had he been sentenced under the 2002 Guideline manual, his base offense level for Counts Eight through Fifteen (charging possession with the intent to distribute meth) would have been capped at 30 because the district court applied a mitigating role adjustment. Instead Rodriguez's base offense level was found to be 36 under the 2005 Guideline manual. If that discrepancy impacted the offense level determination, Rodriguez's ex post facto argument would prevail.

But Rodriguez's analysis falls short by one step--a step fatal to his position. It fails to take account of his other conviction on Count Sixteen for maintaining a drug-involved premises. There the district court found the mitigating role adjustment did not apply and, after considering other relevant adjustments, determined the total offense level to be 31. Under Guideline § 3D1.3(a), because that was the highest offense level of the counts of conviction, it controlled the determination of the ultimate Guideline range. And that would have been the case had the total offense level for Counts Eight through Fifteen been calculated to be even lower under the 2002 Guidelines. In the end, then, the district court's application of the 2002 rather than the 2005 Guidelines would have resulted in the same total Guideline calculation and sentencing range for Rodriguez, so he was not disadvantaged at all.

Rodriguez also urges that the district court erred in failing to consider the

18

disparity between mixed and actual meth in calculating his sentence. Although he did not raise the issue at his sentencing, he contends on appeal that *Kimbrough v. United States*, 552 U.S. 85 (2007) and like cases call for a reversal and remand to the district court to consider the issue.

As an initial matter, Note (B) to the Drug Quantity Table in Guideline § 2D1.1[6] states:

> In the case of a mixture or substance containing PCP, amphetamine, or methamphetamine, use the offense level determined by the entire weight of the mixture or substance, or the offense level determined by the weight of the PCP (actual), amphetamine (actual), or methamphetamine (actual), whichever is greater.

In Rodriguez's case, because the offense level determined by the weight of the meth mixture was greater than that determined by the weight of the actual meth (36 versus 32), the district court used the offense level resulting from the weight of the total mixture.

*Kimbrough*, 552 U.S. at 91 (citations omitted) clarified that the crack/powder cocaine disparity in the Guidelines was not mandatory and explained that a judge, in determining whether "a within-Guidelines sentence 'is greater than necessary' to serve the objectives of sentencing, . . . may consider the disparity between the Guidelines' treatment of crack and powder cocaine offenses." But

---

[6] That Note is the same in both the 2002 and 2005 Guideline manuals.

19

while that decision may arguably supply an analogy to give a district court discretion to reduce a defendant's sentence below that specified in Note (B), it surely does not require us to find the district court unreasonable in adhering to that Note in sentencing Rodriguez.

Nor does *United States v. Santillanes*, 274 F.App'x 718 (10th Cir. 2008) warrant a reversal of Rodriguez's sentence.[7] Unlike Rodriguez, the defendant in *Santillanes* raised the disparity argument during his sentencing and argued on appeal that the district court had committed procedural error by failing to address adequately his argument about the Guidelines disparity between actual and mixed methamphetamine levels.

We express no view as to the persuasive force of *Santillanes* under those circumstances--but before us Rodriguez's claim of sentencing error is necessarily only one of unreasonableness under the Section 3553(a) factors. And in those terms it cannot be said that Rodriguez's within-Guidelines sentence was substantively unreasonable (see *Rita v. United States*, 551 U.S. 338, 347-51 (2007)). We therefore conclude that the district court did not err either in using the

---

[7] We note parenthetically that our Circuit Rule 36-3 continues to provide that even our own unpublished dispositions are nonprecedential except under law of the case or preclusion principles. Out-of-circuit dispositions of the same nature obviously carry no greater weight--indeed, Tenth Circuit Rule 32.1(A) does not give an order and judgment such as *Santillanes* precedential force even before that court.

20

2005 Guideline manual or in adhering to the Guideline treatment of actual and mixed methamphetamine in determining Rodriguez's sentence.

**AFFIRMED.**

BERZON, J., dissenting in part:

I concur in the disposition, except as to count 11 of the Indictment, charging Efren Rodriguez with possession with intent to distribute and distribution of 152.1 grams of methamphetamine on August 12, 2002. I would hold that there was insufficient evidence to support a conviction on an aiding and abetting theory for that charge, as there was no evidence that Rodriguez "participate[d]" in that particular transaction "as in something that he wishe[d] to bring about." *United States v. Ramos-Rascon*, 8 F.3d 704, 711 (9th Cir. 1993).